Pamela A. BEERS, Appellant,

v.

Glenn A. BEERS, Appellee (Two Cases).

Superior Court of Pennsylvania.

Argued Oct. 30, 1997.

Filed March 30, 1998.

John R. Mondschein, Elizabeth A. Drey and Mondschein Associates, Allentown, for appellant.

John Evanoff, Allentown, for appellee.

Before CAVANAUGH, SCHILLER and MONTEMURO *, JJ.

MONTEMURO, Judge:

This is a consolidated appeal from two orders respectively awarding primary custody of the parties' minor children to Appellee, and denying Appellant's request for emergency relief and for contempt.

The parties to this litigation were married in June of 1979. There are three children of the marriage: Jonathan, born Feb. 13, 1979, Christopher, born Nov. 13, 1983, and Tyler, born Nov. 26, 1993. The parties underwent a prior year long separation in 1987, during which period both parties dated other people. Apparently the precipitating factor was Appellee's emotional distance and lack of involvement with Appellant's concerns. The parties received counseling, and the situation improved temporarily until Appellant's unplanned pregnancy with Tyler. Appellee objected to another child and suggested abortion, an option Appellant was unwilling to pursue. The pregnancy was a difficult one, and Appellee provided little or no emotional support, thus vitiating any improvements produced by the post separation counseling.

During the late summer of 1995, the parties' eldest son, Jonathan, using the family's home computer became involved with America Online, as subsequently did Appellant. Through this medium she began corresponding by E-mail with a man, John Seitz, whom she met in person sometime after the parties' separation in September of 1995. At separation, Appellant remained in the marital residence with the children while Appellee moved into his parents' home nearby, and in January of 1996, into his own apartment. In February of 1996, Appellant informed Appellee that she planned to relocate in May to New London, Chester County, a drive of one hour and forty-five minutes from the parties' house in Emerald, Lehigh County, in order to live with Mr. Seitz. Appellee's Petition for Emergency Relief, filed ten days prior to Appellant's contemplated move, resulted in an order preventing the relocation pending

the outcome of a custody conference scheduled for the end of May. At the conference, the parties agreed upon a shared custody arrangement by which the children would spend one week at a time with each parent, Appellee returning to the marital residence, in anticipation of the trial scheduled for August.

At trial, the court, after determining that the matter was governed by the principles enunciated by this Court in *Gruber v. Gruber*, 400 Pa.Super. 174, 583 A.2d 434 (1990), and that Appellant failed to meet her burden of proof as established by that case, vested primary physical custody of the children in Appellee. Appellant appealed from this order, and subsequently filed a Petition for Extraordinary Relief and for Contempt, pursuant to which a second hearing was held in March of 1997. Relief was denied, and a second appeal taken from the denial order. The appeals were consolidated and are now before us for review.

We first note that our scope of review in custody cases is extremely broad:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.... However, the broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and, thus, represent a gross abuse of discretion.

*Gancas v. Schultz*, 453 Pa.Super. 324, 683 A.2d 1207, 1209 (1996) (quoting *Vineski v. Vineski*, 450 Pa.Super. 183, 675 A.2d 722, 723 (1996)).

 Moreover, "[i]n custody proceedings, the paramount concern is the welfare of the children and all considerations, including the

---

* Retired Justice assigned to the Superior Court.

rights of the parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being." *Plowman v. Plowman,* 409 Pa.Super. 143, 597 A.2d 701, 707 (1991).

Both parents in this matter are unarguably fit, and both have much to offer the children. Appellant, who has worked in both part and full time jobs during the marriage, is unemployed. Although she had attempted to obtain employment near her new home, and in fact received two job offers, due to the uncertainty occasioned by the custody process, she was unable to start either position when required. Appellant is termed a wonderful mother by the trial court for her nurturing skills, the devotion she has shown to the children, and the positive, indeed, "impressive" relationship she has fostered with them. She was nine months pregnant with Mr. Seitz' child at the time of the second hearing.

Mr. Seitz is the principal shareholder and chief executive officer of a company which manufactures optical products, and employs approximately 40 people. In addition to his salary, approximately $36,000, he receives rent and royalties, and has the potential to earn even more than he presently makes. Mr. Seitz testified to his willingness to provide for Appellant and her children at his home, and his testimony revealed him to be a generous and well intentioned person whose financial resources far exceed those of Appellee. Apparently, he and Appellant are seriously contemplating marriage once Appellant's divorce becomes final.

Appellee is an electronics technician with a medical equipment company, earning between $28,000–30,000 per year. He is active in scouting, and coaches baseball, in both of which Jonathan did and Christopher still does participate. He clearly cares about his children, has always been a significant factor in their lives, and has attempted to make himself more emotionally available to them.

Appellant first argues that the trial court erred in characterizing this as a relocation case controlled by *Gruber, supra.* Whether a proposed move *within* the jurisdiction of the courts of this Commonwealth is subject to *Gruber* analysis presents a case of first impression. *Gruber* itself commences by an-

nouncing that: "The issue in this case is the standard to be applied by a trial court in determining under what circumstances a parent who has primary physical custody may relocate *outside* the jurisdiction of the court." *Id.* 583 A.2d at 435 (emphasis added). There the custodial parent sought to relocate herself and her children from Pennsylvania to Illinois. And, although in expounding its rationale the court speaks of "geographical distance," it makes clear from the outset that the distance is contemplated as synonymous with jurisdictional remove. While two other cases have applied the *Gruber* standard to intrastate relocations, neither discusses whether there is any distinction to be drawn between intra- and inter-jurisdictional relocations. *See Zalenko v. White,* 701 A.2d 227 (Pa.Super.1997); *Gancas v. Schultz,* 453 Pa.Super. 324, 683 A.2d 1207 (1996). The court in *Gancas, supra,* which requires that the father's contemplated move within the jurisdiction be analyzed along with the mother's proposed relocation to New Jersey, does so in the context of "competing custodial environments," *id.* 683 A.2d at 1213, which must be assessed, *Rowles v. Rowles,* 542 Pa. 443, 668 A.2d 126 (1995), rather than on the basis of geographical remoteness. Thus the trial court's automatic assumption, made without explanation, that *Gruber* governs the outcome here is premature.

The *Gruber* analysis involves a three pronged inquiry:

1. The court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not a momentary whim on the part of the custodial parent . . .

2. Next, the court must establish the integrity of the motives of both the custodial and the non-custodial parent in either seeking the move or seeking to prevent it . . .

3. Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship

between the child and the non-custodial parent.

*Id.* at 439.

■ As this Court has consistently held, *Gruber* refines upon, but does not alter the basic and determinative inquiry as to the direction in which the best interests of the child lie. *See Gancas, supra; Plowman, supra; Lee v. Fontine,* 406 Pa.Super. 487, 594 A.2d 724 (1991). And, application of a *Gruber* analysis to cases of relocation within the Commonwealth involves one difficulty which does not exist where the relocation crosses a jurisdictional border, that is, the absence of a literal bright line criterion beyond which all such moves must be so examined. The existence of a state border obviates the necessity to set an artificial boundary. For relocation within a state, however, the question becomes what constitutes a geographical distance significant enough to alter the relationship between the non-custodial parent and the child(ren). Unfortunately, there is no easy answer, as the variables in this regard are too numerous to anticipate; for example, even short geographical distances become insurmountable obstacles for those without an automobile in areas where public transportation is poor or non-existent. Accordingly, we decline to establish a mileage or drive-time limit. Rather, in keeping with the notion that *Gruber,* although integral to a best interests analysis in the context of an in-state relocation is not necessarily controlling of the outcome, *see Plowman, supra; Lee, supra,* the trial court must first ask whether the parent/child relationship will be affected in any negative, material way, and in its discretion determine whether such an inquiry is appropriate in a given case. In the instant matter, the trial court was correct in deciding to apply the *Gruber* criteria.

Appellant also argues that *Gruber* requires an order awarding primary physical custody to be in place before any determination of whether a proposed move should be permitted, since it is the child's best interests in the context of the primary family unit which must be considered. The absence of such an order neither impedes a *Gruber* inquiry prior to a custody decision, nor prevents our assessment of whether a proper award of primary physical custody was made in this case. Rather, we must simply analyze the current family units to evaluate the effects of the trial court's decision.

Given its place in the context of a best interests determination, the value of *Gruber* lies not so much with the formulation of a novel inquiry concerning the relocation of the primary family unit, but with its insights into why the elements of that inquiry might be critical. Because here there were two, not one, primary family units preceding institution of the custody award, both must scrutinized similarly in the examination of competing custodial environments to which *Rowles, supra,* refers. Indeed, this Court has held that the trial court should be permitted to decide custody before the child is relocated, in order to assure that the custodial parent fulfills his/her responsibility toward the interest of the non-custodial parent in maintaining a relationship with the child. *Plowman, supra.*[1]

Whether the trial court's conclusions here were correctly drawn in both instances is the subject of Appellant's remaining issues, which assert, respectively, that the court erred in finding a move to New London would not substantially improve Appellant's own quality of life, nor derivatively, that of the children; that it erred in finding that the children's best interests did not require them to be raised together in Appellant's primary custody; and that it erred in upholding the initial order placing them in Appellee's primary custody. As these are all, in fact, aspects of the same challenge to the trial court's discretion in making the award, we address them together.

The trial court determined that Appellant had not borne her burden of proving that a home in New London offered any advantages over the marital residence in Emerald. In terms of school quality and availability of favored activities, the two familial environments were determined to be roughly equiva-

---

1. Contrary to the concern expressed by the Dissent, we are indeed saying that *Gruber* may apply to an in-state relocation. We merely emphasize that in such cases the decision as to the applicability of the *Gruber* analysis is left to the discretion of the trial court.

lent. The slight edge possessed by New London due to its rural setting and Mr. Seitz's membership in a local club which owns a lake and camping facilities is counterbalanced by Appellee's involvement with scouts and baseball. However, as the trial court's Opinion demonstrates, all of the external, non-familial elements pale into insignificance when placed next to the real pivot around which custody determinations revolve, that is, the parent/child relationship in each family unit.

The court grounded its decision to award primary custody to Appellee on several factors: first, that all the boys were currently thriving, both Jonathan and especially Christopher being very good students with friends and appropriate activities, and nothing offered by Appellant would improve her or their situation; second, that the siblings should not be raised separately absent compelling reasons to the contrary, see Pilon v. Pilon, 342 Pa.Super. 52, 492 A.2d 59 (1985), and Jonathan's presence offered the two younger boys a positive role model which would be eliminated if they moved to New London, as Jonathan's best interests clearly required him to stay in the marital residence with Appellee during his senior year in high school; and third, that Appellee had made efforts to improve his interaction with his sons, and a move would deprive them of this benefit.

It should be noted with regard to the first of these findings, that during the period referred to by the trial court, that is, prior to the initial hearing in August of 1996, Appellant had been resident in Emerald until approximately the end of the school year. Thereafter, during the summer, the parties functioned according to a custody arrangement in which the younger children spent every other week in her company, and Jonathan made himself available on the rare occasions when his work and social schedule permitted. The children's performance can thus be attributed to both parties' influence, and the substantial continuation of Appellant's role as primary caretaker. However, no mention was made of the fact that the move, which is accepted at face value by the court, represents an improvement both in psychological and material terms for Appellant; the reason for the relocation is Appellant's relationship with Mr. Seitz, whom the children testified that they like and respect.

Although the court asserts that any discussion concerning Jonathan is academic as the parties agreed that his best interests lay in remaining in Emerald, he is, nevertheless, a critical factor in the court's reckoning. At the time of the first hearing, Jonathan was a senior in high school, with a part time job and many social activities; he candidly admitted spending little time at home, although he also stated that he would be disturbed if his brothers lived elsewhere. At the second hearing, his college plans were in place, and involved continuing to live with his father for at least two years. Although, given these arrangements and his age, 18 at the time of the second hearing, Jonathan has never been the subject of any custody order, he figures almost as largely as Appellee in the court's rationale for the current arrangement, both in terms of his brothers' projected quality of life, and the well-settled policy of keeping siblings together.

At the second hearing, Jonathan testified that he would be studying engineering at Pennsylvania State University; his schedule neither then nor prospectively, as a matriculated college student, was explored, but this Court may take notice that given class attendance, studying, and the job he needs to repay Appellee for his car loan, his presence in his brothers' company will not increase even if it is not reduced from the infrequent level he maintained while in high school. Although the trial court was correct in identifying Jonathan as a role model for his brothers, he is not, and cannot be an assistant father, which is apparently what was being expected of him. Jonathan has neither the time nor the maturity to compensate for any deficiencies of either of his parents. Once he became a college student, the expectation that he would baby sit, or otherwise be available as a parent surrogate was neither reasonable nor fair. Thus the courts' reliance on the policy of raising siblings together as a reason to award custody to Appellee was misplaced in this instance.

The court also points to Appellee's improved rapport with his sons as a reason to award him primary custody, although, in the same breath the court concluded that despite Appellee's efforts, the relationship between Christopher and his father was not a warm one. Indeed, the court notes that both Christopher and Jonathan, whose judgment the court greatly admires, seek advice and help first and foremost from Appellant. Moreover, Christopher was described by the trial court as uncommunicative to anyone, including his older brother, who has attempted, unsuccessfully, to persuade Christopher to talk to him or to their father. This situation did not improve over the period following the first hearing, during which Appellant obtained custody only on alternate weekends. At both the August 1996 and March 1997 hearings Christopher indicated his desire to live with his mother, as did Jonathan.

Indeed, Christopher's unwillingness or inability to bond with Appellee provides a major impetus for the court's custody award. Notwithstanding this emotional distance, the court concludes that "[w]ith these attempts by the father and the continued urging of Jonathan, there is the likelihood of an eventual close relationship between father and son. However if relocation is permitted, the chance of significant relationship between father and son is low," whereas the relationship with Appellant "had reached such a point of development that it will continue unimpeded and can be nourished both by phone and by in-person visitation, if the mother continues to live in New London." (Trial Ct.Op. at 17.) There has been no finding here, nor any allegation, that Appellant has interfered with or impeded Appellee's opportunity to form a bond with his children. The parties do not denigrate each other, nor undermine each other's efforts to educate, instruct and otherwise assist their children's progress. Given these circumstances, if the court's analysis is indeed true, we would inquire at whose door any failure is to be laid, and whether the children are to be the subjects of a social experiment, the outcome of which even the court finds to be a matter of serendipity. We do not believe the best interests of the children are to be left to fate. If Appellee wants a positive relationship with Christopher, it is up to him to establish one, with or without primary custody.

As to four year old Tyler, it will be some time before he is old enough for involvement in the activities Appellee enjoys. While his basic needs are being attended to, there are lapses in his care, as is evidenced by testimony that the child was being bathed only twice a week, that his language and eating habits had deteriorated to some degree, and that he was not toilet trained until shortly before his third birthday. It is also in connection with Tyler that the question of flexibility in custody arrangements has arisen, without provoking comment by the trial court. On three occasions Tyler has become ill while on a weekend visit with Appellant, once running a temperature of 104 degrees. Appellee, in each instance insisted that the child return to Emerald rather than remaining overnight with Appellant, and that his father, Tyler's grandfather, would seek medical care for Tyler the next day should Appellee deem it necessary. We find that such rigidity is not in the best interests of so small a child.

Finally, when asked why the children would be better off in his primary custody, Appellee's responses were entirely self-referential, couched in terms of his own wishes. While the trial court excuses this as a "lack of sophistication in phrasing responses [rather than] a lack of good faith as to the welfare of the children," (Trial Ct.Op. at 19), we are not entirely convinced. While we believe the court is accurate in stating that Appellee believes he is a positive factor in his children's lives, a belief that is itself clearly justified, such a belief is not the exclusive determinant of the children's best interests.

Regarding other factors on which the trial court comments, it is noted that the motives of both parties are appropriate, that Christopher's preference for his mother rests, at least partially, on the legitimate basis that she is helpful to him, both in practical terms, e.g., his homework, and psychologically, because she is more understanding. However, the court notes, quite correctly, that a child's preference is not controlling, *Snarski v. Krincek,* 372 Pa.Super. 58, 538 A.2d 1348

(1988), and that some of Christopher's motivation is too materialistic to be helpful.

As to the availability of "realistic, substitute visitation arrangements which will adequately foster the relationship" between Appellee and the children, the court's conclusion is in essence to deny that they exist, pointing instead to the possibility of alienation between Appellee and Christopher should primary custody be transferred to Appellant. Again, we find this conclusion untenable, as the relationship between father and son has shown negligible improvement despite the current geographical proximity.

The trial court's Opinion rests expressly and in large measure upon what is seen as Appellant's lack of credibility: her inability or unwillingness to reveal the name of a man with whom she had a relationship nine years prior to these proceedings, while the parties were separated; the unclarity of her work status in New London—this despite the recognition that her having worked during the marriage had no appreciable effect on her performance as a mother then; and her evasiveness in describing the initiation of her connection with Mr. Seitz. However, the court fails to explain how any of these matters has or conceivably might have adversely affected the children. As against these putative deficiencies, which we accept as within the trial court's purview to advance as irrefutable facts, is the equally irrefutable fact that Appellee's relationship, with Christopher at least, is problematic. Despite Appellee's commendable efforts and personal commitment, at some level Christopher is not receiving from Appellee the emotional support he needs. That this should be the case as he enters his teenage years, when such support is critical, makes any deficiency all the more unfortunate. This Court has consistently held that "[w]here both parents are determined to be equally fit, the fact that a stable, long-continued and happy relationship has developed between the child and one parent may be of critical importance to the formulation of a custody decree." *Stolarick v. Novak,* 401 Pa.Super. 171, 584 A.2d 1034, 1037 (1991). *See, e.g., English v. English,* 322 Pa.Super. 234, 469 A.2d 270 (1983).

■ There is, too, the matter of Appellant's child with Mr. Seitz, and the necessity that the children become accustomed to this new brother; that the child will be a half-sibling is of no moment. *See generally In re Davis,* 502 Pa. 110, 465 A.2d 614 (1983). Finally, this Court has noted the importance of the "day-to-day routine and the day-to-day emotional interaction between parent and child.... These myriad and ordinary contacts forge the child's character, psychological health, and value system." *Gruber,* 583 A.2d at 438. Appellant has, for most of the children's lives been the person with whom most of these quotidian interactions took place. She has, even in the trial court's own estimation, done a sterling job. We find it to be in the children's best interests that she be allowed to continue in this role despite the distance.

Accordingly, we reverse and remand for proceedings consistent with this Opinion.

Order reversed. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

CAVANAUGH, J., files a dissenting opinion.

SCHILLER, J., files a concurring opinion.

SCHILLER, Judge, concurring.

Although the Court's decision in *Gruber*[1] was addressed to parents relocating out of state, the logic employed by the Court applies equally to relocations within the state. *Zalenko v. White,* 701 A.2d 227 (Pa.Super.1997). However, in those situation such as the present, where a court is being asked to make an initial custody determination, a comprehensive "best interest" analysis should address such issues as location of the parent seeking custody, and the accessibility of the non custodial parent. Therefore, a separate *Gruber* analysis is not necessary.

In my view a *Gruber* analysis is necessary only when the party who has previously been awarded custody by a court is seeking to relocate. In such a situation the *Gruber* paradigm will aid the trial court in reevaluat-

---

**1.** *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990).

ing the factors which first resulted in the award of custody to the relocating parent. However, I see no need to employ this separate analysis when the trial court is operating on a clean slate. Thus, the planned relocation of a custodial parent in a voluntary custody arrangement will not invoke *Gruber,* but that relocation will necessarily be a factor in arriving at the conclusion of what is in the best interest of the children.

Regarding the best interest of the children in the present case, I agree with the analysis of the facts advanced by Justice Montemuro. Therefore, I join in the decision to reverse the trial court.

CAVANAUGH, Judge, dissenting:

I respectfully dissent. The majority reverses the order of the trial court which found it in the best interests of the children that primary custody be with the father, Glenn A. Beers.

To the extent that the majority opinion decides that *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990), does not apply to parent relocation cases with the Commonwealth, I disagree.

In my opinion, the *Gruber* analysis applies when there is a significant proposed relocation from one community to another which entails different educational facilities, cultural, religious, and commercial environments regardless of whether or not a state line is crossed. Furthermore, I believe a removal from Northern Lehigh County to Southern Chester County in Pennsylvania, is a proposed move which properly merits a *Gruber* analysis.

I would affirm the order of the trial court based upon the thorough and well-reasoned opinion of The Honorable William E. Ford dated September 12, 1996. See, *Com. Ex Rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984) where the court noted "[o]nly where [an appellate court is] constrained to hold that there was a gross abuse of discretion should [it] interfere with the decisions of the hearing judge." *Id.* at 236–37, 478 A.2d at 806 (quoting *Com. ex rel. Spriggs v. Carson,* 470 Pa. 290, 296, 368 A.2d 635, 637 (1977)). See also, *Robinson v. Robinson,* 538

Pa. 52, 645 A.2d 836 (1994) (only where it is found that a custody order is manifestly unreasonable as shown by the evidence of record is an appellate court allowed to interfere with the trial court's determination); *Moore v. Moore,* 535 Pa. 18, 634 A.2d 163 (1993) (although scope of review in custody cases is broad, appellate court erroneously substituted its own judgment for that of the trial court); *McMillen v. McMillen,* 529 Pa. 198, 602 A.2d 845 (1992) ("th[e] broad scope of [appellate] review [in custody cases] does not vest in the reviewing court the duty or the privilege of making its own independent determination"); *Lombardo v. Lombardo,* 515 Pa. 139, 527 A.2d 525 (1987) (appellate court exceeded its scope of review where it undertook its own independent review of the record).

I would affirm the order of the trial court.