**Samuel B. GOLDFARB, Appellee,**

v.

**Irene GOLDFARB, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 14, 2004.
Filed Oct. 27, 2004.

Neil H. Stein, Philadelphia, for appellant.

David L. Ladov, West Conshohocken, for appellee.

Before: FORD ELLIOTT, MONTEMURO* and JOHNSON JJ.

OPINION BY MONTEMURO, J.:

¶ 1 This is an appeal from an order awarding primary physical custody of the parties' three children to Appellant mother with partial custody in Appellee father, which disposition is predicated upon Appellant's continued residence in the United States; Appellant's relocation would result in the transfer of primary custody to Appellee.

¶ 2 Appellee, who was born in the U.S., remaining here until graduation from high school, and Appellant, an Israeli citizen, met and were married in Israel in 1990. Three children were born of the marriage, Noam in July of 1991, and Amit in March of 1994. The third child, Nadav, was born in the United States in August of 1998, after the parties had moved to Connecticut for Appellee, a physician, to complete his residency. After three years there, the parties relocated to the Philadelphia area so that Appellee could pursue further training. During this period, the parties traveled to Israel, where Appellee's parents and Appellant's extended family reside, at least twice a year.

¶ 3 In January of 2002 Appellee left the marital residence after a six month in-house separation, an estrangement precipitated by Appellee's relationship with another woman, Jennifer Williams, which had commenced some six months before. Appellee filed for custody in August of 2001, and hearings were held the following February, pursuant to which a temporary order of shared custody was entered, in large measure due to the trial court's reliance on the stated desire of the two older children for such an arrangement. At the same time the court ordered a custody evaluation, after which further hearings were held culminating in the order underlying this appeal.

¶ 4 In custody cases this court's scope of review is extremely broad:

The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it... However, the broad scope of review does not vest in the reviewing court the duty or privilege of making its own independent determination ... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the court's factual findings; and, thus, represent a gross abuse of discretion.

*Beers v. Beers*, 710 A.2d 1206, 1207 (Pa.Super.1998), *appeal denied*, 556 Pa. 701, 729 A.2d 1124 (1998) (citations omitted).

¶ 5 Appellant has presented us with three issues on appeal challenging the trial court's finding that this appeal should be quashed because of an overlong Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P.1925(b); the trial court's refusal to allow Appellant to return to Israel with the children; and the trial court's failure to obtain a complete trial record, specifically by failing to require testimony from Appellee's paramour. We will address these seriatim.

* Retired Justice assigned to Superior Court.

■ ¶ 6 Appellant's first claim is a response to the trial court's conclusion that the twenty-four assignments of error raised in Appellant's 1925(b) Statement is, by analogy to Pa.R.C.P. 2116(a),[1] so excessively lengthy as to warrant quashal of the appeal. In support the trial court relies on this Court's decision in *Estate of Lakatosh,* 441 Pa.Super. 133, 656 A.2d 1378 (1995), which concerns itself with violation of Rule 2116(a). However, there we chose not to dismiss the appeal. Similarly, in *First Lehigh Bank v. Haviland Grille, Inc.,* 704 A.2d 135, 138 n. 2 (Pa.Super.1997), we declined to impose the sanction of dismissal for a violation of Rule 2116(a), finding it worthy only of admonishment.

¶ 7 In fact, the analogue applied by the trial court is invalid, as, given our decisions, is its suggestion that quashal is appropriate. Unlike Rule 2116(a), Pa.R.A.P. 1925(b) imposes no specific restrictions on length; the word "concise" appears in its text without explanation. More critically, even were the comparison legitimate, we would point out that quashal of appeals for violation of the appellate rules is not an act within the purview of the trial court, which, once the notice of appeal is filed, loses jurisdiction over the case and may not proceed further save in some exceptional circumstances not replicated here. Pa.R.A.P. 1701. Thus, had the trial court failed to address Appellant's issues under the misapprehension that it possessed the authority to quash the appeal for a perceived violation of an appellate rule, the nature of this case in particular would have constrained us to remand for preparation of an Opinion under Rule 1925(a), which is intended to provide the appellate courts with a reasoned basis for the order appealed from. *Cooke v. Equitable Life Assur-*
*ance Society,* 723 A.2d 723 (Pa.Super.1999). However, the necessity to do so has been obviated by the court's examination of the most salient of Appellant's claims, among which, of those repeated here, is her first assertion that the trial court erred in refusing to allow her to relocate to Israel.

■ ¶ 8 Appellant's preliminary argument in this regard is that because Israel is her and the children's "homeland" her request to return there is not a matter for application of the test enunciated by this Court in *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990). We disagree, first noting that "[a]s this Court has consistently held, *Gruber* refines upon, but does not alter the basic and determinative inquiry as to the direction in which the best interests of the child lie." *Beers, supra* at 1209. Instead, "it provides direction to critical elements of [the classical best interest] analysis." *Hurley v. Hurley,* 754 A.2d 1283, 1285 (Pa.Super.2000). Even if Appellant wishes to characterize her transfer from this jurisdiction to another as repatriation, such removal is, in fact, relocation, and thus necessitates an examination of the reasons for and the effect of such a change. Appellant also argues that even under the strictures of *Gruber,* the best interests of the children analysis would be served by allowing her to return to Israel with them. The three pronged *Gruber* analysis involves the following inquiries:

1) [T]he court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not a momentary whim on the part of the custodial parent. . . .

---

1. Pa.R.A.P. 2116(a) prescribes the allowable length of the Statement of Questions Involved section of an appellate brief, and is "to be considered in the highest degree mandatory, admitting of no exception." *Id.*

2) Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it. . . .

3) Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Gruber, supra* at 439.

¶ 9 Before we undertake our examination of this case, we note that rather than commencing its own examination with an assessment of the "potential advantages" of the proposed move for Appellant as the custodial parent and concomitantly the children, the trial court prefaces its rationale with the determination that Appellee's relationship with the children, while the product of his "active and important role" in the children's lives, would not withstand the separation. (Trial Ct. Op. at 10). The court's premise and conclusion seem mutually exclusive: the allegedly high quality of the Appellee's relationship with the children would seem to argue resilience and permanence rather than fragility and evanescence. The juxtaposition, however, is emblematic of the court's approach to this case, which, while ostensibly engaged in a *Gruber* inquiry, in actuality focuses on other matters mainly connected to the personalities of the litigants.

■ ¶ 10 There was uncontested testimony that Appellant is a trained nurse, indeed, she met Appellant at a hospital where, should she return to Israel, a job is waiting for her. In addition, she is credentialed as a midwife, and holds a master's degree in public administration with an emphasis on health care. However, her limited command of English, *inter alia*, prevents her from utilizing her professional skills in this country, and required the presence of a translator at trial as well as during sessions with the custody evaluator. Her only employment here has been in the children's parochial school as a teacher's assistant in Hebrew. However, because of administrative changes in the school, her application to continue in that job was denied. She testified without contradiction that she is not qualified to teach in any of the other, similar, parochial schools, and that she is unable otherwise to work in this country.

¶ 11 Indeed, even the trial court found that

the reality is she's not going to be able to get the kind of job here that perhaps she could get there. She might make more money at a lower job here than she would there, but at this point, she doesn't have the same credentials that would be worthy of something here as it would be there.

(N.T., 5/7/03, at 153). Nevertheless, the court inexplicably found that "[s]ound economic advantages of the proposed move were not demonstrated, and it was apparent that employment opportunities exist here, as evidenced by Mother's employment, and would generate a salary commensurate with that which would be available to Mother in Israel." (Trial Ct. Op. at 13–14). There was literally nothing in the record to support the court's conclusion on this point; quite the contrary, since Appellant is dependent in large measure on financial support from Appellee which was apparently not always forthcoming in a timely manner. Moreover, even if the court was technically correct that the compensation for work here and in Israel were comparable, the difference in the non-economic aspects of the jobs available to Appellant here and in Israel were well understood and accepted by the court. This Court has continually recognized that economic benefits are not the

only factor to be considered in the determination of whether relocation substantially improves a parent's quality of life. *See, e.g., Anderson v. McVay*, 743 A.2d 472, 474 (Pa.Super.1999).

¶ 12 In this regard, Appellant testified that she had few friends here, and her only family consisted of a cousin in New Jersey, that the culture was different, and everything more difficult. The court found that, while it did not dispute the existence of "certain substantial non-economic benefits to Mother in a move to Israel ... such as family connections and nationality interests," (Trial Ct. Op. at 14), these "had not stood in Mother's way in Mother's initial support of the decision earlier made for the family to relocate to the United States under, it is acknowledged, a different set of circumstances[.]" (*Id.*). Against the context of the trial testimony, the court's statement is startling. Even Appellee concedes that the parties' original intention with regard to the move to this country had been in anticipation of returning to Israel once his training was completed. The "different set of circumstances," referred to by the trial court, that is, the necessity of a move to advance Appellee's career, was the impetus behind Appellant's willingness to relocate to this country. That this decision, made for the benefit of the family, should now be used to discredit Appellant's wish to return to Israel is contrary to both the spirit and the letter of the legal authorities addressing relocation issues. This is particularly so in view of the court's finding that Appellant's motivation was neither whim nor vindictiveness.

¶ 13 In fact, Appellant's situation here is strikingly similar in many respects to that of the appellant in *Gruber, supra.* There,

[t]he record showed that mother considered herself to be living in an alien environment, surrounded by people she knew solely through her now-estranged husband. She had no close friends in the area and no family. Whatever support she may have received from her in-laws prior to the dissolution of the marriage apparently no longer existed for her after the marriage failed. Mother expressed considerable feelings of loneliness and anxiety due to her isolation from friends and family in what was obviously a time of crisis. Her living arrangements were about to expire, leaving her with no desirable alternatives. She was unemployed and had little hope of becoming immediately self supporting ... Her relationship with appellee was marred by frequent confrontations, at least some of which occurred in front of the children.

*Id.* at 440. Almost all of the circumstances described here find close if not exact parallels in Appellant's case, and all are exacerbated by her less than excellent grasp of English. In comparison to this dismal state of affairs, Appellant testified that the parties' apartment in Israel, now hers, had been adapted to accommodate all three children, since only two had been born before the parties moved to Connecticut. Part-time employment as an emergency room nurse was available to her with flexibility for the children's school and play schedules. The school was itself described, and a schedule provided. Appellant testified to the presence of her parents and sister in the area, and the network of friends with whom she had grown up.

¶ 14 As to whether, given this potential for improvement in Appellant's life, the best interests of the children lie in relocation, the court states unequivocally that, despite Appellee's excellent qualities as a father, Appellant "has been and should remain the [children's] primary physical custodian." (Trial Ct. Op. at 11). The

history of the custody arrangements in this case amply supports that conclusion.

¶ 15 At the apparent behest of the children,[2] a 50/50 custodial arrangement was ordered by the court after the first set of hearings. However, they were so miserable with that arrangement as to elicit the court's recognition that Appellant should be awarded primary custody. Indeed, Noam became clinically depressed by the situation itself, and spontaneously reported to the custody evaluator his feeling of guilt and responsibility for having been instrumental in visiting it on his brothers. It was also revealed that the alleged "request" was prompted by Appellee, who convinced the children that the court would order any custody arrangement they wished, and that equally shared custody would be the only fair division. Appellee, a pediatrician, denied the existence of any psychological problem created by his influence.

¶ 16 This too, is consistent, as it was also repeatedly pointed out by the psychologist appointed by the court as a custody evaluator that, despite Appellee's undoubted parenting skills, his attentiveness to the children's interests and needs is secondary to his own, to which he responds much more readily. Even the children find him manipulative and evasive, particularly with regard to his relationship with Miss Williams. The evaluator also noted, again without comment from the court, that Appellee's account of his participation in the children's lives was inconsistent with Appellee's own description of his schedule. It is notable that the trial court refrains from comment on these aspects of Appellee's personality.

¶ 17 As to the second prong of *Gruber*, as already noted, the court found that Appellant's desire to move was not motivated either by whim or spite. No finding was made as to Appellee's reasons for opposing a move. However, there is no reason to believe he is doing so merely to thwart Appellant.

■ ¶ 18 The third *Gruber* inquiry, conducted by the trial court in the first instance, concerns itself with the availability of "realistic, substitute visitation arrangements." *Gruber, supra* at 439. The trial court concluded, in essence, that there were none, and that the suggested long distance arrangements were not "an adequate substitute for the regular contact enjoyed by the children with Father under a more shared arrangement." (Trial Ct. Op. at 12). However, this is not the test. If it were, no necessity for a *Gruber* analysis would ever have arisen, as physical proximity would be a *sine qua non* of most if not all custody determinations. *Gruber* was enunciated to address a condition which unfortunately exists with distressing frequency, and may not be wished away. Certainly, where the parents are both fit, as they are here, children benefit from frequent contact with both. Indeed, they benefit most from intact marriages. However, where circumstances cannot be created which replicate a stable marital relationship, satisfactory substitutes must be found, hence the necessity for *Gruber*.

¶ 19 Here, the court's insistence on the high quality of Appellee's relationship with the children contradicts the court's conclusion that deterioration is inevitable. There is no support in the record for its dire prediction, and, in any event, it is within Appellee's power, partial custody notwithstanding, to insure that the relationship is maintained. *Compare Beers*,

**2.** Only Noam and Amit were ever interviewed by the court, as all parties considered Nadav too young for such an experience.

*supra.* However, although the court determined that the best interests of the children lay with Appellant as their primary custodian because of the beneficial effect of her presence and the children's own preference, the court expressed concern whether Appellant would foster a healthy relationship between the children and Appellee, since she had tended to cast him, his family and his paramour, Ms. Williams, in a "disfavorable (sic) light." (Trial Ct. Op. at 17). This brings us to a discussion of the court's emphasis on matters of personality which do not comport in all instances either with the record or the court's conclusions.

¶ 20 Repeatedly over the course of its Opinion, the trial court has cast aspersions on Appellant's attitude toward Appellee, the veracity of her statements about him, and the effect of those statements on the custody evaluator. What the court fails to say is that Appellee has been equally negative, questioning even Appellant's sanity and that of her family despite the total absence of any evidence of psychopathology. Indeed, Appellee's behavior toward or comments about Appellant are never the subject of any criticism by the court even where these have an adverse effect on the children. Unfortunately, vilification of one party by the other is a frequent by-product of divorce/custody litigation, and must be discounted on both sides unless the conduct complained of adversely affects the children.

¶ 21 Here, the custody evaluator stated on numerous occasions that he accepted neither party's version of events without corroboration from outside sources. Thus the court's insinuation that the evaluator was influenced by Appellant is unpersuasive, especially given the court's ultimate finding that Appellant should be the primary custodian. Indeed, the evaluator admitted that he harbored a personal dislike

for Appellant, finding her personality histrionic and abrasive, although conceding that these characteristics were at least partially cultural. The trial court, albeit tacitly, seems to have adopted the same attitude. However, despite their antipathy, both the court and its chosen expert agree on Appellant's qualifications as the parent deserving to have charge of the children a majority of the time. The evaluator even goes so far as to find this an exceptional case, in that contrary to practice he suggests that the court "should seriously consider Mother's desire to relocate to Israel." (Report of Gerald Cooke, Ph.D., at 54). He continues: "it is my opinion that her life would immediately be far better in Israel than it is in the United States," and the "benefits would flow to her children." (*Id.*).

¶ 22 Thus, after careful consideration of the record, we find the court's decisions with respect to the *Gruber* factors to be manifestly unreasonable.

¶ 23 We would also note, as a coda to this decision, that Appellant has alleged error in the court's failure to obtain testimony from Appellee's paramour, with whom even the court admits Appellee is, despite disclaimers, "unquestionably likely still involved." (Trial Ct. Op. at 12). The children, have, from the outset, experienced difficulty in dealing with Ms. Williams, who apparently arouses in them feelings of disloyalty to Appellant, even when Appellee is at pains to assure that the children are not frequently in her company. She will almost certainly continue to be a part of their lives so long as her involvement with Appellee lasts; if Appellant had relocated without them, she might well have become a significant part, particularly if, as is alleged in Appellant's brief, she now resides with Appellee. That the court made no effort to receive Ms. Williams' testimony to evaluate her credi-

bility and indeed suitability as a factor in the children's upbringing was error. However, in view of our resolution of this case, it is harmless.

¶ 24 We therefore reverse in part, and remand for proceedings necessary to construct a revised visitation schedule which allows Appellant's relocation, and Appellee's partial custody.

¶ 25 Order reversed in part and case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.