# Piskurich v. Peitz

C.P. of Allegheny County, no. FD 02-6005-003.

*Scott B. Horowitz,* for plaintiff.
*Paul M. Daniels,* for defendant.

WECHT, *J.,* April 5, 2006—Plaintiff Stephen J. Piskurich (Father) appeals this court's February 6, 2006 order granting defendant Antoinette Peitz (Mother) primary physical custody of the parties' minor children and allowing Mother to relocate to Deerfield Beach, Florida with the children.

## BACKGROUND

The parties never married. They met while both were employed by OK Grocery. (1-25-06 R. at 73.) The parties began dating in or around September 1998. (2-2-06 R. at 7.) They lived together from December 1998 until September 27, 2005. (1-25-06 R. at 6.) During that period, Mother gave birth to the parties' two children, Stephen (date of birth: June 27, 1999) and Samantha (date of birth: November 13, 2000). From May 2001 until September 2005, the parties lived in a home owned by Father. (1-25-06 R. at 6-7.)

Both parties were born and raised in Allegheny County. Mother's parents are divorced. Mother's mother resides in Penn Hills. (1-25-06 R. at 22.) Mother also has aunts and uncles residing in Allegheny County. (1-25-06 R. at 22.) Mother testified that her mother saw the children "once a week, once every two weeks" when Mother and the children were living in Pittsburgh. (1-25-06 R. at 23.) Mother testified that she saw her aunts and uncles on

birthdays and holidays. (1-25-06 R. at 22.) Mother's father, Mark Peitz (Maternal Grandfather), lives in Deerfield Beach, Florida. Mother's brother also lives in Deerfield Beach, where he works for Maternal Grandfather's company. (1-25-06 R. at 22.)

Father's parents live about five houses up the hill from Father's residence. (2-2-06 R. at 11.) While Mother testified that the paternal grandparents' contact with the children was limited, Father testified that the paternal grandparents saw the children "just about every day if it was nice out," and the children were outside. (1-25-06 R. at 23; 2-2-06 R. at 11-12.) Father also has a brother, two sisters, aunts, uncles, and cousins in the Pittsburgh area. (2-2-06 R. at 11.)

At the beginning of the parties' relationship, Mother was employed in the shipping and receiving department at OK Grocery. (1-25-06 R. at 73.) Following Stephen's birth in 1999, the parties agreed that Mother would stay home and that Father would work. (1-25-06 R. at 29-30; 2-2-06 R. at 9.) Prior to leaving Pittsburgh in September 2005, Mother had been working part-time for Regis Steedle Candies. (1-25-06 R. at 16-17, 51-52.) From October 2005 through January 2006, Mother worked as an administrative assistant at Maternal Grandfather's company, Miami Environmental and Construction Services, in Deerfield Beach, Florida. (1-25-06 R. at 17, 50-51.)

Father is in his twenty-fifth year of employment in shipping and receiving at OK Grocery Company. (2-2-06 R. at 5.) Father testified that, for the past five years, he worked the 2 p.m. to 10 p.m. weekday shift. (2-2-06

R. at 5.) Father further testified that his work shift "also entails us going into work early which would be four hours early, two hours early and also staying over any denominations of two, three or four hours." (2-2-06 R. at 5.)

On September 27, 2005, Mother took the children to Maternal Grandfather's home in Deerfield Beach, Florida. Mother testified that Father knew that Mother was leaving. (1-25-06 R. at 43, 72.) Father testified that, although he noticed that Mother had been removing items from the home, Mother stated that she "didn't know" if she was going to move out. (2-2-06 R. at 18.) Father testified that the first indication that he had that Mother had taken the children to Florida was when she called him from the airport to let him know that she had parked his car there. (2-2-06 R. at 18.)

On October 12, 2005, Father presented a "petition for special relief" before the undersigned requesting that Mother be directed to return the children to Allegheny County. By order of the same date, this court granted Father's request. On October 13, 2005, Father filed a "complaint for primary physical custody" of the children.

On October 27, 2005, Mother filed an "answer to complaint for primary custody and counterclaim for primary custody." On the same date, Mother presented a motion for reconsideration of this court's October 12 order, and also raised new matter concerning her request for relocation. By consent order dated October 27, the parties agreed that Mother would return with the children to Allegheny County as soon as possible and that the par-

ties would share physical custody of the children pending a hearing on Mother's request to relocate with the children to Florida. The order further provided that Stephen would be re-enrolled in the Shaler Area School District.

At hearing, both parties testified that Father agreed to allow the children to remain in Florida until January 2006 in order to finish the school semester. (1-25-06 R. at 8-9; 2-2-06 R. at 19, 28.) Father had custody of the children in Allegheny County from November 19-20, 2005 and December 23-24, 2005. (1-25-06 R. at 10-12; 2-2-06 R. at 19-20.) Mother testified that she and the children returned to Allegheny County on January 18, 2006. (1-25-06 R. at 12-13.) At the time of hearing, Stephen had been re-enrolled at Marzolf Elementary School in the Shaler Area School District. (1-25-06 R. at 13.)

This court conducted a one and one-half day custody relocation hearing on January 25 and February 2, 2006. This court heard testimony from both parties and from Maternal Grandfather. Following careful deliberation upon the facts of the case and the applicable law, and upon review of proposed orders submitted by both parties, this court issued its February 6, 2006 order granting Mother primary physical custody and allowing her to relocate to Deerfield Beach, Florida with the children.

This court's order provided that Father would have custody of the children every third weekend, alternating between Allegheny County and Deerfield Beach. The order also provided that Father would have six weeks of summer custody; the entire winter break (although the parties are to alternate the Christmas holiday *provided*

Mother comes to Allegheny County); the entire spring break; and time on Thanksgiving Day *provided* Father travels to Florida. Further, the order provided that Mother shall afford Father liberal visitation (including overnights) in the event that he travels to Florida at other times at his own cost. The order provided the same rights to Father in the event that Mother travels to Allegheny County with the children at other times not specified in the order. As to the cost of transportation, this court's order provided that Mother would be responsible for the cost of the every third weekend visits and that the parties would split all of the other transportation costs equally.

On February 17, 2006, Father filed a notice of appeal from this court's February 6 order. By order dated February 21, 2006, Father was directed to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). In his statement, filed on March 3, 2006, Father raises the following issues for review:

"(1) The court abused its discretion and/or committed an error of law by failing to properly apply the 'factors' outlined in the *Gruber* case, 400 Pa. Super. 174, 583 A.2d 434 (1990), in its allowance of Mother to relocate to Deerfield, Florida where evidence was presented that the move would not significantly improve the quality of life of the parent and children, that the move was not motivated simply by the desire to frustrate the visitation rights of the non-custodial parent or impede the development of a meaningful parent-children relationship in the feasibility of substitute visitation arrangements to insure [sic] a continuing relationship between the children and the custodial parent.

"(2) The court abused its discretion and/or committed an error of law in allowing Mother to relocate where she hid the plan to relocate out of state from Father, removed herself from the jurisdiction without seeking original court approval, failed to timely return the children upon initial court order directing her to do so, failed to even examine the possibility of alternate living arrangements and/or such employment possibilities in Allegheny County and was limiting on Father's time with the children upon her return to jurisdiction [sic].

"(3) Assuming arguendo that the court was correct in its allowance of Mother to relocate, the court further abused its discretion and/or commit [sic] an error of law in providing Father a visitation/partial custody arrangement that greatly reduces Father's time with the minor children and only provides him with one weekend per month, six weeks during the summer and the spring and winter breaks (the Thanksgiving break can also be partially Father's if he goes to Florida), when Father had daily contact with the minor children prior to the relocation."

## DISCUSSION

In deciding relocation requests, Pennsylvania trial courts must follow the standards set forth in *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990). The *Gruber* court stated that the trial court must consider:

"[1] the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent; . . .

"[2] the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; and . . .

"[3] the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Gruber,* 400 Pa. Super. at 184-85, 583 A.2d at 439.

While the trial court must consider the above factors concerning the potential relocation, the child's best interest remains at the heart of the trial court's determination. Accordingly, the trial court must consider "all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being" in making its decision in a relocation case. *Kirkendall v. Kirkendall,* 844 A.2d 1261, 1263-64 (Pa. Super. 2004), quoting *Dranko v. Dranko,* 824 A.2d 1215, 1219 (Pa. Super. 2003).

The Superior Court also has directed that in cases in which no prior custody determination has been made, a trial court cannot sua sponte assume that one parent is the primary caretaker and then apply the *Gruber* factors in order to determine whether that parent's request to relocate should be granted. See generally, *Marshall v. Marshall,* 814 A.2d 1226, 1230-31 (Pa. Super. 2002); *Beers v. Beers,* 710 A.2d 1206, 1209 (Pa. Super. 1998). Instead, both parties must be placed on equal footing, and the trial court, in applying the *Gruber* factors, must "scrutinize both custodial environments without favoring one over the other." *Beers,* 710 A.2d at 1209. Accordingly, the only burden carried by either of the parents is to establish what is in the best interest of the child. See *Burkholder v. Burkholder,* 790 A.2d 1053, 1058-59

(Pa. Super. 2002), citing *Hurley v. Hurley,* 754 A.2d 1283, 1287 (Pa. Super. 2000).

In the instant case, no custody order was in place before Mother took the children to Florida on September 27, 2005. Thus, this court was required to consider both custodial environments equally in making its determination. The evidence established that it is in the best interest of the children to be in the primary custody of Mother.

Both parties testified that they agreed that Mother would stay home with the children. (1-25-06 R. at 29-30; 2-2-06 R. at 9.) Mother testified that she left Father's residence with the children because it was a "hostile situation." (1-25-06 R. at 15.) Mother testified that Father "belittled" her in front of the children, calling her "a pig . . . a bitch, a cunt" and telling her that she did not know how to take care of the children. (1-25-06 R. at 24-25.) Mother testified that these comments had a particular impact upon Stephen, who began having behavior problems beginning in his second year of pre-school. (1-25-06 R. at 25.) Mother described Stephen's behavior as follows:

"[W]hen I would tell him something, he wouldn't listen. It was like he was—women's authority he wouldn't respect. I was getting put down by his father, and he was treating his sister nasty and being—his teachers were having problems with him in school." (1-25-06 R. at 25.)

Mother also testified that Stephen would say "Daddy said you're a pig" or "Mommy's a pig." In February 2003, Mother began taking Stephen to a psychiatrist at Western Psychiatric Institute. (1-25-06 R. at 37.) Stephen ini-

tially saw the psychiatrist bi-weekly, and then monthly. (1-25-06 R. at 37.) Stephen still was attending counseling at the time Mother took the children to Deerfield Beach. (1-25-06 R. at 37.) Mother testified that Father refused to participate in Stephen's counseling, stating that Stephen didn't need counseling and Mother "just couldn't handle him." (1-25-06 R. at 37.) Mother enrolled Stephen in counseling in Florida "about one week" after she and the children arrived in September 2005. (1-25-06 R. at 65.) Mother testified that, after three visits, Stephen's behavior was improving, and therefore the counselor allowed Stephen to come in on an "as-needed basis." (1-25-06 R. at 38.) Stephen also was doing very well in school in Florida. (1-25-06 R. at 39.)

Mother offered copious evidence concerning the custodial environment that she is able to provide in Florida for the children with the assistance of Maternal Grandfather. For example, Mother presented evidence concerning Maternal Grandfather's home and surrounding area, and the schools the children attended in fall 2005. (1-25-06 R. at 16, 111, 20-21, 61.) Both Mother's and Maternal Grandfather's testimony established that Maternal Grandfather is able to provide a positive environment for the children in his home.

In contrast, Father presented little to no evidence of the custodial environment that he would provide. Father verified that the parties had agreed that Father would work and Mother would be the primary caretaker of the children, yet when asked if, while they were living together, Mother spent most of her time caring for the children, Father answered, "We split that pretty much mutu-

ally. The only time she spent caring for the children were the times that I wasn't home." (2-2-06 R. at 9, 29.) In light of Father's testimony that his job entails working the 2 p.m. to 10 p.m. shift on weekdays, as well as going in to work two to four hours early and staying two, three, or four hours past his shift, it appeared that there was a lot of time that Father was not home.[1]

As to the time that Father spent with the children, Mother agreed with Father's testimony that he would sometimes watch the children on weekends while Mother worked at Regis Steedle Candies. (2-2-06 R. at 60.) However, Mother added that there were many weekends when one or both children came with her to work while Father went on a golf outing in the summer or to Steelers games in the fall and winter. (2-2-06 R. at 60.)

Moreover, Father admitted that he did not attend either child's pre-school graduation ceremony and had attended just one to two medical appointments with the children. (2-2-06 R. at 47, 39.) Yet Father testified that he has 10 sick days and five personal days available per year, plus five weeks of vacation. (2-2-06 R. at 30.) When Father was asked if it was true that he had not participated in Stephen's counseling, Father replied "I was totally against it. I was not for that and I didn't participate in it." (2-2-06 R. at 40.)

---

1. Father testified that he could bid in the near future on the 6 a.m. to 2 p.m. shift. (2-2-06 R. at 6.) Father testified that he would not have been able to bid on this schedule successfully last year, but could bid successfully on it this year because 40 employees ahead of him in seniority had retired. (2-2-06 R. at 39.)

Based upon the foregoing evidence, this court concluded that Mother is able to provide the better custodial environment for the children and determined that awarding primary physical custody of the children to Mother is in the children's best interests.

As to Father's first issue raised on appeal, this court properly applied the *Gruber* factors. In doing so, this court determined that the potential advantages of the move to Deerfield Beach outweigh the potential disadvantages. The *Gruber* court suggested the following approach to the trial court's analysis under the first prong of the *Gruber* test:

"In considering the prospective advantages to the move, a court shall not limit itself solely to enhanced economic opportunities for the custodial parent but must also assess other possible benefits of the relocation. For instance, relocation may be motivated by a desire to return to a network of family or friends, or to pursue educational opportunities, or to seek an improved physical environment in which to live and raise children." *Gruber,* 400 Pa. Super. at 184, 583 A.2d at 439.

In the instant case, Mother provided evidence establishing that Maternal Grandfather provides emotional and financial support to Mother and the children, that Mother will be able to finish her education with this support, and that Maternal Grandfather's home in Deerfield Beach is an excellent area for children in terms of education and activities. It is also significant that Maternal Grandfather supports Father's relationship with the children. Maternal Grandfather testified that he would never try to stop Father from seeing the children. (1-25-06 R. at

104-105.) Father and Maternal Grandfather agreed that they have a cordial relationship. (2-2-06 R. at 28-29.)

As to the improved financial picture for Mother in Florida, Mother testified that, with her $500 per week salary working as an administrative assistant for Maternal Grandfather, she is able to save money. (1-25-06 R. at 90, 63.) Maternal Grandfather testified that this job is still open to Mother and that her job performance is "way better" than the person who held the job before her. (1-25-06 R. at 108.) The evidence established that Maternal Grandfather not only has provided financial support and childcare, but that he has been a positive role model for the children. (1-25-06 R. at 39-40, 88-89.) Also, both Mother and Maternal Grandfather testified that Maternal Grandfather would assist Mother in returning to college to finish her Bachelor's Degree. (1-25-06 R. at 62-63, 108.)

Finally, the evidence established that the Florida schools offer excellent educational opportunities for the children and that the children are able to participate in the same activities that they participated in while living in Allegheny County. For example, Mother testified that Stephen was getting "technology electives" in first grade at Quiet Waters Elementary in Deerfield Beach and that these electives were not offered at Shaler Area. (1-25-06 R. at 20.) Mother also testified that Samantha was learning material in her pre-kindergarten program at La Petite Academy in Deerfield Beach that Stephen had been learning in kindergarten at Shaler Area. (1-25-06 R. at 21.) Mother testified that Stephen was performing better in school in Florida than he had in Allegheny County.

(1-25-06 R. at 54.) Mother also testified that Stephen and Samantha's activities in Allegheny County (baseball and dance, respectively) were available in Deerfield Beach. (1-25-06 R. at 76-77.)

As to the second part of Father's first issue raised on appeal, this court agrees that evidence was presented that the move was not motivated simply by Mother's desire to frustrate Father's visitation rights or to impede the development of the relationship between Father and the children. This court determined that both parties appeared to be motivated by the best interest of the children. Mother did not appear to be motivated by a desire to frustrate Father's visitation rights. To the contrary, Mother and Maternal Grandfather offered to fly the children up to Allegheny County to see Father once per month. (1-25-06 R. at 42, 105.) Further, Mother offered to split the children's winter and spring breaks, as well as the summer. (1-25-06 R. at 43.)

With regard to Father's second issue raised on appeal, this court found in its order that Mother had engaged in self-help in taking the children to Florida without first seeking Father's permission or leave of court. This court expressly disapproved Mother's unilateral action, and ordered Mother to return the children pending hearing. However, after conducting that evidentiary hearing, this court determined that Mother's request for relocation should be granted. As to Father's allegation that Mother "failed to timely return the children upon initial court order directing her to do so," both parties testified that Father agreed to allow the children to remain in Florida until January 2006 to finish the school semester. (1-25-

06 R. at 8-9; 2-2-06 R. at 19, 28.) With regard to Father's allegation that Mother "failed to even examine the possibility of alternate living arrangements and/or such employment possibilities in Allegheny County," Mother provided the following explanation concerning her move to Florida:

"I had no money at the time, and my father had—was able to help me out and give me a job, so I would be able to support my children and ultimately get on my feet again." (1-25-06 R. at 15.)

There was no evidence presented that Mother could obtain a job in Allegheny County comparable to her salaried job in Deerfield Beach with flexible hours to allow Mother to be available for her children before and after school.

As to Father's final allegation in his second issue that Mother "was limiting on Father's time with the children upon her return to jurisdiction" [sic], the evidence did not support this allegation. Mother testified that she returned with the children to Allegheny County on January 18, 2006. (1-25-06 R. at 13.) Father testified that, since the children's return to Allegheny County, he had custody of the children every Saturday from 11 a.m. to Sunday at 8 p.m. (2-2-06 R. at 22-23.) When Father was asked on cross-examination why he did not have the children overnight on Sunday so that he could feed them breakfast before school on Monday morning, Father replied that, "Mrs. [sic] Peitz requested that she have them back at 9 on Sunday." (2-2-06 R. at 45-46.) Yet, Father did not testify that he had requested additional time with the children and that Mother had denied his request.

As to Father's third issue raised on appeal, the *Gruber* court offered the following instruction concerning the availability of realistic, substitute visitation arrangements:

"We recognize that, in many cases, former weekly visitation may have to give way to an altered schedule which allows for less frequent but more extended contact between parent and child. However, the necessity of shifting visitation arrangements to account for geographical distances will not defeat a move which has been shown to offer real advantages to the custodial parent and the children." *Gruber,* 400 Pa. Super. at 185-86, 583 A.2d at 439.

Accordingly, even if Father had daily contact with the children, the fact that his schedule with the children necessarily must change with the relocation does not alone defeat the relocation. See *Billhime v. Billhime,* 869 A.2d 1031 (Pa. Super. 2005). Moreover, while both parties testified that Father had daily contact with the children before they traveled to Florida in September 2005, the evidence suggested that the contact was somewhat limited. Mother maintained that the time Father spent with the children on weekdays was limited to half an hour or so before school because the children were in bed by the time Father arrived home from work. (1-25-06 R. at 57; 2-2-06 R. at 58-59.) Father admitted that he was missing the children's activities because he was at work. (2-2-06 R. at 38.)

Instantly, the custody schedule that this court devised for Father provides him with "less frequent but more extended contact." See *Gruber,* 400 Pa. Super. at 185,

583 A.2d at 439. The schedule provides that Father will have weekends with the children once every three weeks. Father also was granted the entirety of the winter break (provided that Mother does not travel to Allegheny County to share the Christmas holiday); the entirety of spring break; and half of the summer. Father was granted some time on the Thanksgiving holiday *provided* he travels to Deerfield Beach. This court directed Mother to afford Father "liberal and reasonable visitation (including overnights)" at all other times that Father elects to travel to Florida at his own expense, provided that Father gives Mother reasonable notice. (2-6-06 order, ¶ D.1.) Mother also was directed to afford the same rights to Father at all times she visits Allegheny County with the children. (2-6-06 order, ¶ D.2.) It cannot be gainsaid that this created a custody regime that affords the children substantial, ongoing time with their Father.

For the foregoing reasons, this court's February 6, 2006 order should be affirmed.