Lisa BILLHIME, Appellant,

v.

Darin BILLHIME, Appellee.

Superior Court of Pennsylvania.

Argued Jan. 12, 2005.

Filed Feb. 25, 2005.

Susan M. Hill, Bloomsburg, for appellant.

Thomas E. Leipold, Bloomsburg, for appellee.

BEFORE: BENDER, GANTMAN, and JOHNSON, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Lisa Billhime ("Mother"), asks us to determine whether the Montour County Court of Common Pleas erred when the court denied her petition to relocate, with the two minor children of her marriage to Darin Billhime ("Father"), from Pennsylvania to Florida. Upon a thorough review of the record and the applicable law, we hold the trial court's decision is unreasonable with respect to the factors involved in a proper *Gruber*[1] analysis, where the evidence of record supports a finding that the non-economic factors, such as returning to her network of family and friends, will substantially improve Mother's quality of life, and the many benefits will flow to the children. Accordingly, we reverse the trial court's decision to deny Mother's relocation request, and remand for proceedings necessary to construct a revised visitation

---

1. *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990).

schedule to accommodate Mother's relocation and Father's partial custody.

¶ 2 The relevant facts and procedural history of this appeal are as follows. The parties were married in California on December 2, 1994. Mother is a part-time actress and Father is a radiology technician. In late 1996, the parties moved to Orlando, Florida, where Mother's family is located. The parties' twin boys, A.B. and E.B., were born on December 30, 1996. Mother pursued work in the Orlando-area entertainment industry, which generally involved one or two days at a time doing commercials, voice-overs, and small roles. In 2000, she began working full-time as a bookkeeper and salesperson. Father's pattern of employment in Florida was unsteady. The children began attending a Christian pre-school in Orlando.

¶ 3 In January 2001, the family relocated to rural Pennsylvania. They purchased a farm which had been owned and operated by Father's family for five generations. Father spent the first two to three months renovating the family home and farming. He then took a job as a part-time radiology technician, but was laid off after about nine months. He was fired from his next job as an X-ray technician after five or six months. Father then spent the next nine months farming, which proved financially unviable. He now commutes more than one hour each way to a full-time job as a radiology technician in Harrisburg. He is on-call one weekend each month, and occasionally works overtime. This position provides medical benefits for the family.

¶ 4 Mother continued doing sales work for her Orlando employer out of her Pennsylvania home for a period of time. Her income during the year prior to moving was about $40,000.00, derived mainly from non-acting work. Her income during the first year in Pennsylvania was about $4000.00. Mother has continued to pursue her acting career, which often involves extensive commutes to New York, Philadelphia and Baltimore for auditions, with no guarantee of employment. During 2003–04, she acted for ten to twelve successive weekends in Johnstown, Pa. Mother has not sought full-time work outside of acting while in Pennsylvania. The children had attended a Christian pre-school, but are now home-schooled exclusively by Mother.

¶ 5 The parties have a history of separating and reconciling, which involves Mother's allegations of physical abuse by Father.[2] During a six to seven month separation in 1998–99, Father moved to New Mexico to live and work with his mother. He returned to Florida, but the parties separated for another period of time in October 2003. Their final separation occurred on February 14, 2004. Mother continued to live with the children in the marital home on the farm. Father has lived across the street with his father and stepmother.

¶ 6 Mother filed a complaint in divorce on March 25, 2004, seeking primary physical custody of the minor twin boys. On May 26, 2004, the parties and their respective counsel attended a court-ordered conference with a Special Master. On June 17, 2004, the trial court entered an interim order, incorporating by reference the Master's recommendations, which included the following: (1) parties to share legal custody of the minor children; (2) primary physical custody to Mother; (3) partial

---

**2.** Mother had filed a PFA petition after one of these *incidents of physical abuse.* (N.T., 7/28/04, at 4–5, 102–103). Though Father denied the abuse, he agreed to leave the marital home for eighteen months. (*Id.* at 95–97).

We note the certified record does not contain supporting evidence regarding incidents of abuse or specific allegations alleged in the petition.

physical custody to Father every Tuesday and Thursday evening and alternating weekends; (4) parties to comply with designated holiday and vacation schedules; (5) Mother may take the minor children to visit her family in Florida up to three times per calendar year, for no more than twenty-one days per trip; and (6) parties are reciprocal child care providers of choice if either is unable to care for children during their respective custodial time. (*See* Report to the Court of Special Master, filed June 7, 2004, at 4–8.)

¶ 7 On July 7, 2004, Mother filed an emergency petition for custody requesting permission to relocate with the minor children to Florida. At the court-ordered hearing on July 28, 2004, Mother and Father each testified. Mother revealed she wishes to return to Orlando, Florida to benefit from the love, support, and encouragement of her extensive family, many friends from childhood, and her church community, now that she and Father are separated. (*Id.* at 12). Moreover, the boys would be returning to a familiar place, where they have maintained close relationships with family and friends, and still remember the school they would enroll in if they moved back. (*Id.* at 38). This school has offered places for the boys and a scholarship covering ninety percent of tuition. (*Id.* at 27–28, 66–68; Mother's Exhibit 1).

¶ 8 Mother stated she believes the move will enable her to provide more financial security for herself and the children. Mother indicated she had a job offer in the customer service department of a car dealership at $11 per hour, with an opportunity to increase her salary with bonuses or promotions, stable health benefits for the family, and a flexible schedule to allow for work in the entertainment industry. (*Id.* at 20–22; Mother's Exhibit 2). She has notified her agent and other contacts in

Orlando of her intent to move back, and has received several letters indicating she could quickly reestablish herself in the Orlando-area entertainment industry. (*Id.* at 39–40; Mother's Exhibit 3). Mother claimed she has not found a comparable work schedule in rural Pennsylvania, where it is difficult to be available on short notice for auditions which involve long commutes, travel expenses, and no guarantee of salaried work. (*Id.* at 14–19). By comparison, Orlando can offer her more opportunities to do salaried acting work close to home. (*Id.* at 14). Thus, Mother maintained that returning to Orlando would substantially enhance her economic and personal situation as a single mother, and thereby benefit the children.

¶ 9 Mother contended the family moved to Pennsylvania when Father's father offered to sell them the family farm, after foreclosure on their Florida home. (*Id.* at 9). Mother agreed to relocate only on the condition that she and the children could travel frequently to Florida to be with her family. (*Id.* at 9–10). Mother claimed the children have had a minimal relationship with their paternal grandfather and his wife, even though they live across the street. Father's mother has not been in contact with the family for the past four years. (*Id.* at 7). Father's sister lives in Chicago, and there is no other extended family in the area. Mother alleged Father has told her he would consider moving to California, and would let Mother move there as well. (*Id.* at 32–33, 57–58). Mother stated she would not oppose Father moving back to Florida. (*Id.* at 38).

¶ 10 Mother proposed an alternative schedule for partial custody whereby Father would have the boys during most of summer vacation, from early May to early August, two weeks at the Christmas break, and one week during spring vacation. Mother hoped Father would make fre-

quent visits to see the boys in Florida, and stated that her aunt and uncle offered to have Father and the boys stay with them at no cost. (*Id.* at 37).

¶ 11 Father testified he is concerned the relocation will have a detrimental effect on the close relationship he shares with the children. He stated that the purpose of moving to Pennsylvania was to enable the family to be closer with each other by being together full-time on the farm. (*Id.* at 87). Though he has spent considerable time with the children, Father conceded his current full-time job prevents him from being with them as much as when he farmed. (*Id.* at 108). Father indicated there are fine Christian schools for the boys to attend in their area, if Mother chose to stop home-schooling. (*Id.* at 73–74). Father acknowledged Mother's close relationship with her extended family in Florida, but felt the current custody arrangement allowed her to spend a significant amount of time visiting them. He denied knowing about the proposal from Mother's aunt and uncle to stay with them while visiting the children in Florida. Furthermore, he has no personal relationship with them, and said he would feel uncomfortable as a guest in their home. (*Id.* at 78–79).

¶ 12 The trial court entered its order on August 3, 2004, denying Mother's emergency petition to relocate. Mother filed this timely appeal.

¶ 13 Mother raises the following issue on appeal:

DID THE TRIAL COURT FAIL TO PROPERLY APPLY THE *GRUBER* TEST IN DENYING APPELLANT'S REQUEST TO RELOCATE FROM PENNSYLVANIA TO FLORIDA WITH THE MINOR CHILDREN?

(Mother's Brief at 3).

¶ 14 Our scope of review in child custody matters is broad. *Goldfarb v. Goldfarb,* 861 A.2d 340, 342 (Pa.Super.2004).

The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it.... However, the broad scope of review does not vest in the reviewing court the duty or privilege of making its own independent determination.... Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the court's factual findings; and, thus, represent a gross abuse of discretion.

*Id.* (citing *Beers v. Beers,* 710 A.2d 1206, 1207 (Pa.Super.1998), *appeal denied,* 556 Pa. 701, 729 A.2d 1124 (1998)). *See also Boyer v. Schake,* 799 A.2d 124, 126 (Pa.Super.2002). Moreover, on issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses. *Dranko v. Dranko,* 824 A.2d 1215, 1219 (Pa.Super.2003).

■ ¶ 15 Mother argues the trial court did not fully consider all the economic and non-economic advantages to her and the children of the proposed relocation to Florida. Mother asserts the benefits of being able to work in entertainment without a long commute to job assignments, and a steady job with medical coverage for her family would substantially improve her quality of life, and indirectly, that of her children. Mother claims once the divorce is finalized, she will no longer be covered under Father's health care insurance, and his erratic employment pattern might not guarantee coverage for the children, which has happened during Father's past periods

of unemployment. Mother urges that her history of frequent travel to her family in Florida during the marriage is indicative of how significant a role her extended family plays in her life and the lives of the children.

¶ 16 Mother contends the trial court's inference that her motives for moving are questionable is not supported in the record, and the court did not analyze Father's motives for opposing the relocation. Mother complains the trial court utilized an impossible standard, when it concluded that a realistic substitute for Father's current visitation schedule was not available, given the distance from Florida to Pennsylvania. Thus, Mother concludes the court's cursory analysis of the *Gruber* factors, and inferences unsupported by competent evidence, led to an unreasonable decision. We agree.

¶ 17 The primary concern in all child custody matters is the best interests of the children. *Arnold v. Arnold,* 847 A.2d 674, 677 (Pa.Super.2004). "The 'best interests' standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the children's physical, intellectual, moral and spiritual well-being." *Id.; Johns v. Cioci,* 2004 PA Super 492, 17, 865 A.2d 931, 936 (2004).

¶ 18 When a custodial parent seeks to relocate with the parties' children, the court must accommodate competing interests of the parties, which include:

The custodial parent's desire to exercise autonomy over basic decisions that will directly affect [her] life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of [his] children; and, finally, the state's interest in protecting the best interests of the children.

*Geiger v. Yeager,* 846 A.2d 691, 696 (Pa.Super.2004). Thus, in relocation cases, the court must balance the parties' interests in light of the best interests of the children by analyzing the specific factors set forth in the *Gruber* case, as follows:

1. The court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not a momentary whim on the part of the custodial parent.

\* \* \*

2. Next, the court must establish the integrity of the motives of both the custodial and the non-custodial parent in either seeking the move or seeking to prevent it.

\* \* \*

3. Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Gruber, supra* at 439.

¶ 19 Initially, the custodial parent seeking to relocate has the burden to show the move would significantly improve the quality of life for that parent and the children. *Id.* at 440. The trial court must consider whether the custodial parent seeks enhanced economic opportunities, as well as other possible benefits, such as returning to a network of family and friends or an improved physical environment. *Id.* at 439; *Schake, supra* at 127. The custodial parent need not prove that a move is necessary before relocation is permitted, or that she has investigated all possible job opportunities in her current

location. *Yeager, supra* at 698 (citing *Maurer v. Maurer,* 758 A.2d 711 (Pa.Super.2000)). Importantly, the court may not ignore or underestimate any factors which are likely to contribute to the well-being and general happiness of the custodial parent and the children. *Gruber, supra* at 439.

¶ 20 Next, the court must be confident the custodial parent is not seeking to frustrate the visitation rights of the non-custodial parent, and will comply cooperatively with alternative visitation arrangements necessitated by the move. *Id.* Similarly, the non-custodial parent must show that his resistance to the proposed relocation is inspired solely by a desire to maintain a close, on-going, parent-child relationship. *Id.* Finally, the court must utilize the following standard in considering whether realistic, substitute visitation arrangements will adequately foster the non-custodial parent's relationship with his children:

> We do not require visitation to be as frequent as prior to the relocation in order to allow the relocation. The necessity of shifting visitation arrangements to account for geographical distances will not defeat a move which has been shown to offer real advantages to the custodial parent and the children. Sensitive case-by-case balancing is required to ensure that all interests are treated as equitably as possible. Furthermore, we are aware that when relocation is likely to result in a substantially enhanced quality of life for a custodial parent, often the [children's] best interests will be indirectly but genuinely served.

*Schake, supra* at 127 (internal citation and quotations omitted).

¶ 21 Instantly, the trial court made the following findings of fact: (1) Mother's reasons to relocate—Orlando is a family-friendly city, it has better work, she has family nearby—and her prospective employment of $11 per hour with only anticipated acting work are not significant improvements in the quality of life for her and the children necessary under Pennsylvania law; (2) Father lives across the street from Mother and the children, is the primary babysitter, sees the children three times each week, and is a fifth generation owner of family farm is valuable; (3) Mother home-schools the children in Pennsylvania and would cease doing so if she relocates; (4) Mother's filing of a PFA petition with "suspect" allegations calls into question her motives for moving under a *Gruber* analysis; and (5) Father's current visitation with the minor children every other weekend and two evenings every week cannot be adequately substituted given the distance from Florida to Pennsylvania. (*See* Trial Court Opinion, filed August 3, 2004, at 1–2.)

¶ 22 In evaluating the relocation request, the trial court did not fully consider Mother's job offer in Florida as her chance to become a financially-independent single parent of the two minor children. Father's unsteady employment pattern, including periods of unemployment which left the family without medical coverage, continues to be a genuine concern. Moreover, Mother has adequately demonstrated the difficulty of securing work close to home in rural Pennsylvania. *See Yeager, supra.* In contrast, Mother's job offer in Florida, with the flexibility and benefits she seeks, is quite likely to contribute to her well-being and general happiness and, thereby, benefit the children's best interests. *See Gruber, supra.*

¶ 23 Further, the court gave cursory attention to the non-economic benefits Mother and the children would enjoy from the support of their extensive network of family and friends in Orlando. *See Yeag-*

*er, supra.* Father's extended family is far less cohesive and minimally involved with the children. While noting the children would no longer be home-schooled by Mother if they relocate, the trial court did not consider whether the boys would benefit from returning to the many educational and social opportunities of the Orlando school which they previously attended. We note the court found valuable that Father has been the primary babysitter, sees the children three times each week, lives across the street, and is the fifth-generation owner of the family farm, but did not consider Father is less available to the children now that he works full time in Harrisburg, or that the farm is not a viable economic enterprise for the family. Additionally, there is every indication the children will retain their close ties to the family farm.

¶ 24 Thus, the evidence supports our conclusion Mother has met her burden under the first prong of *Gruber* to show the potential advantages of the return to Florida will substantially improve the quality of life for her and the children. *See Goldfarb, supra* (holding trial court's denial of mother's petition to relocate to Israel was not in children's best interest was manifestly unreasonable, where family moved from Israel to advance father's medical career, mother wished to return to her country of origin, two of three children had been born there, mother had extensive, supportive family, and better opportunities to continue nursing career); *Yeager, supra* (holding mother was entitled to relocate with child to North Carolina where she had job offer with tuition assistance to advance her career; had secured place of residence; close family lived in area; and comparable job was not available in Pennsylvania).

¶ 25 Next, the court evaluated the integrity of Mother's motives by calling into question her allegations of physical abuse in a PFA petition. (*See* Trial Court Opinion at 2). The court did not even consider the integrity of Father's motives in opposing the move to Florida. Under the standard specified in prong two of the *Gruber* test, the court must determine whether Mother was seeking to frustrate Father's visitation rights, and what truly inspired Father's resistance to the proposed relocation. *See Gruber, supra.*

¶ 26 The evidence firmly established Mother's request to return to Florida was motivated only by her desire to exercise legitimate autonomy over her life and to live close to her family. Mother also proposed reasonable alternative visitation arrangements whereby the children would spend extensive time with Father during summers and school vacations. (N.T. at 37–38). She also indicated she would favor Father moving back to Florida. (*Id.* at 38). Though the court did not address the integrity of Father's resistance to the relocation, Father's testimony revealed that his desire to maintain an on-going, close relationship with the children was without question. Thus, the parties' motives appear legitimate. *See Gruber, supra.*

¶ 27 Lastly, the court determined that Mother's proposed visitation schedule could not adequately substitute for the regular contact Father now enjoys with the children, given the geographic distance involved in the relocation. The proper inquiry, however, under the third prong of *Gruber* is whether realistic, substitute visitation arrangements are available, which will adequately foster an ongoing relationship between the children and Father. *See Goldfarb, supra.* A move that will substantially improve the quality of life for Mother and the children cannot be defeated solely to maintain Father's existing visitation schedule. *See Schake, supra.* Thus, a reasonable, substitute custody

**1040** ■

schedule need not be identical to the custodial arrangement currently in place. *See Gruber, supra.*

¶ 28 Upon a thorough review of the record and the applicable law, we hold the trial court's decision is unreasonable with respect to the factors involved in a proper *Gruber* analysis, where the evidence of record supports a finding that the non-economic factors, such as returning to her network of family and friends, will substantially improve Mother's quality of life, and the many benefits will flow to the children. Accordingly, we reverse the trial court's decision to deny Mother's relocation request, and remand for proceedings necessary to construct a revised visitation schedule to accommodate Mother's relocation and Father's partial custody. *See Goldfarb, supra.*

¶ 29 Order reversed and case remanded for proceedings consistent with this disposition. Jurisdiction is relinquished.