**Donna F. HOWLAND, Appellee**

v.

**Robert H. HOWLAND, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 25, 2006.
Filed May 25, 2006.

---

James Lieber, Pittsburgh, for appellant.

Dawn Gull, Pittsburgh, for appellee.

BEFORE: HUDOCK, MUSMANNO and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Father, Robert H. Howland, appeals from the May 24, 2005 Order, as clarified by the June 1, 2005 Order, modifying his support obligations and ordering him to pay 77% of the expenses relating to the placement of his two children in out-of-state residential care facilities. After careful review, we vacate the Order and remand for proceedings consistent with this Opinion.

D.H. ("the Mother") and R.H. ("the Father") are the parents of four young men currently 18, 15, 14 and 10 years old. The family initially lived in Mt. Lebanon. In May of 1999, the Father moved out of the family home. The Mother and the four boys, then aged 12, 9, 7, and 3, remained in the home until August of 2000, when they moved to Murrysville. The Father consistently provided excellent financial support for the family, both before and after separation, from his employment as a psychologist.[1]

For nearly two years after the Mother and Father separated, the boys stayed with and spent most of their time with Mother while Father saw them occasionally. Then, in March of 2001, the Father withdrew from visiting or communicating with the boys. The Father did this because he believed that poor relations between himself and the Mother was harming the children. In September of 2003, the Mother and father were divorced, and the Father remarried another woman in December of 2003.

The oldest boy, Ben, was a special needs child. At the age of six, he was diagnosed with Tourette's Disorder, Obsessive Compulsive Disorder and Attention Deficit Hyperactivity Disorder. It was very difficult to find an appropriate school or treatment facility for Ben. Although suffering from these serious mental disorders, Ben was at the same time highly intelligent. Mt. Lebanon's

---

1. Although the trial court indicates father is a psychologist, our review of the record and the fact father is an MD, leads us to believe he is a psychiatrist.

public schools did not have a special education program that fit Ben's needs, and he was therefore put in the Baldwin Whitehall school districts special education program. This did not work either, and Ben returned to Mt. Lebanon in sixth grade with the school district providing an aid to accompany Ben at all times.

After the Mother and the boys moved to Murrysville, Ben began getting into trouble. In eighth grade at Franklin Regional public schools, Ben received detentions, suspensions, was arrested for "mooning" a school bus and, at the request of school administrators, withdrew from the school at the end of the year. Ben enrolled in two different private schools, the University School and Kiski Prep, but he was dismissed from both. Ben was hospitalized after attempting suicide, and a few months after his release had a second brush with the juvenile court system. Ben consistently got C and D grades in school, but also consistently scored high on achievement tests.

Because of the involuntary verbal and motor tics associated with Tourette's Disorder, Ben was relentlessly teased and tormented by his peers in each school. During Ben's junior year in high school, which started in the Franklin Regional public schools, things became even more volatile. Other students began picking on him, pushing him and calling him names. He was suspended on at least three occasions for, among other things, fighting. He was nearly arrested again for breaking into a car and stealing alcohol. In early April of that year, another student wrote "fag" on Ben's sunglasses. Ben responded with an email threatening serious bodily injury, for which he was charged in juvenile court with terroristic threats and expelled from school. With-

in about a week, while driving his Mother's car with her in it, Ben ran four stop signs, struck his mother and then intentionally drove into the woods in an effort to kill both of them.

With Ben's Father out of the picture for over three years, the Mother was dealing with this crisis on her own. She immediately called Amy Kelly, M.D., the psychiatrist who had been treating Ben for the last year and a half. Dr. Kelly recommended that Ben be immediately placed in what is known as a residential treatment facility. The Mother gathered information on various residential treatment facilities, and after consulting with Dr. Kelly, enrolled Ben in Discovery Academy in Provo, Utah. Ben could not be told of this in advance since he would have refused to go, and the Mother hired two professional escorts from Discovery Academy. They took Ben to Utah on April 23, 2004.

During the same period of time, Mother had to deal with another crisis involving Tim, the second oldest child. During the end of the previous school year in the Franklin Regional school district, Tim was charged in juvenile court with risking a catastrophe for lighting a high flame on a cigarette lighter on his school bus. Over the summer, Tim snuck out of the home after midnight and paint-balled houses in the neighborhood. After starting eighth grade in September, the Mother was warned by his school principal and the school police that Tim was part of a gang. Specifically, because Tim was physically intimidating at six feet tall and 185 pounds, he was the gang's enforcer. In October, Tim was charged in juvenile court with vandalism for writing on signs. On April 25, 2004 (two days after Ben was taken to Discovery Academy), Tim was arrested for bringing an

eight inch knife to school. Tim spent the next two weeks in a juvenile detention facility. With the advice of an attorney she hired to represent Tim, the Mother enrolled Tim in Ivy Ridge boarding school in Ogdensburg, New York. Juvenile court placed Tim on probation for 18 months, subject to him being placed in Ivy Ridge.

While Tim remained in Ivy Ridge throughout the Spring and Summer without incident, Ben had difficulty with Discovery Academy. Within two weeks of Ben's placement at Discovery Academy, the school informed the Mother it was recommending Ben be transferred to a wilderness treatment program, Walk–About, in Lehi, Utah. In the Walk–About wilderness treatment program, Ben finally found a program where he thrived. Just before he completed the wilderness program in eight weeks, Ben's therapist at the program recommended against sending Ben home or to Discovery Academy again. Since the therapist did not know of any program that could address Ben's unique needs, he recommended the Mother hire an educational consultant. The mother hired Nancy Green of Ardmore, Pennsylvania, who recommended that Ben attended Rancho Valmora in Valmora, New Mexico. On June 30, 2004, Ben began attending Rancho Valmora, and although at first angry, he eventually flourished in the program. The Mother reported in December, 2004 that Ben asked if the could remain there and graduate from Rancho Valmora High School, and that he had applied and hoped to attend college at the University of Pittsburgh in the fall of 2005.

Trial Court Opinion, Hertzberg, J., 8/9/05, at 1–4.

¶ 2 On May 17, 2004, mother filed a petition for modification of child support, requesting father pay his proportionate share of the expenses relating to placement of the parties' children in out-of-state residential treatment facilities. Following a four-day hearing, the hearing officer issued a recommendation on January 4, 2005, to which both parties filed exceptions soon thereafter. On May 24, 2005, the court dismissed father's exceptions, sustained mother's cross-exceptions, and ordered father to pay 77% of the expenses. The May 24, 2005 Order was clarified on June 1, 2005. Thereafter, on June 3, 2005, father filed a motion for reconsideration, which was denied by the court on June 22, 2005. This timely appeal followed.

¶ 3 Father raises five issues for our review:

A. Did the trial court abuse its discretion under the circumstances by requiring Father to contribute extraordinary health care and educational expenses for placements of the parties' children where the parties had shared legal custody and Mother unilaterally made the decisions for those placements without Father's consent and without prior Court approval?

B. Did the trial court abuse its discretion by requiring Father to contribute to extraordinary expenses for placement of the parties' child in residential treatment facilities in Utah and New Mexico under the circumstances where insurance coverage was available for such facilities in Pennsylvania?

C. Did the trial court abuse its discretion by requiring Father to contribute to extraordinary expenses for placement of the parties' child in residential treatment facilities in Utah and New Mexico where such expenses were otherwise unreasonable, unnecessary, and/or excessive under the circumstances?

D. Did the trial court abuse its discretion under the circumstances by requir-

ing Father to contribute to private boarding school expenses for the parties' child?

E. Did the trial court abuse its discretion in the determination of Mother's income and/or earning capacity under the circumstances?

Appellant's brief at 7. For the purposes of our review, we have chosen to address father's claims in a slightly different order than presented in his brief.

■■■ ¶ 4 The standard of review in determining whether a trial court erred in fashioning a support Order is well-settled.

> When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Samii v. Samii,* 847 A.2d 691, 694 (Pa.Super.2004) (citations omitted).

¶ 5 It is well-established in this Commonwealth that an "appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it." *Billhime v. Billhime,* 869 A.2d 1031, 1036 (Pa.Super.2005) (citations omitted). Here, the trial court concluded the expenses associated with placement of

the parties' children in out-of-state care facilities were not excessive or unreasonable. In so ruling, the court noted:

> The Father also contends that Tim could have been placed in a Pennsylvania facility similar to Ivy Ridge at no expense. However, the only testimony on this issue shows that Mother evaluated as many alternatives as possible and there was no free Pennsylvania facility that was similar to Ivy Ridge.

.    .    .    .    .

> For those less affluent then the Father and Mother, sending children to facilities that charge $4,650 per month (Rancho Valmora) and $3,085 per month (Ivy Ridge) is excessive. However, Father's annual income is $261,000, he had $34,000 in his checking account, $18,000 in his savings account and he made charitable donations of $15,000 just to avoid paying taxes on it. . . . Under the unusual conditions that existed in this case, given the Father's ability to afford the expenses, we find the expenses are reasonable and appropriate under the circumstances.

Trial Court Opinion at 6–7.

■■■ ¶ 6 Following a careful review of the record, we find the court's factual findings are not supported by the record and it subsequently misapplied the law in determining father's financial obligations with respect to placement of the parties' children. In Pennsylvania the court may require parents to pay "a designated percentage of reasonable and necessary health care expenses" for their children that are not covered by insurance. 23 Pa.C.S.A. § 4326, **Mandatory inclusion of child medical support,** (e) **Uninsured expenses.** The Child Support Guidelines promulgated by our Supreme Court specifically note "[u]nreimbursed medical expenses of the obligee or the children shall

be allocated between the parties in proportion to their respective net incomes." Pa. R.C.P. § 1910.16–6(c), **Unreimbursed Medical Expenses.** Additionally, § 1910.16–6(c)(2) of the guidelines provides "[a]n annual limitation may be imposed when the burden on the obligor would otherwise be excessive." *Id.*

¶ 7 Here, we find the placement of the parties' children in out-of-state facilities was both unreasonable and unnecessary given the numerous residential treatment facilities in this Commonwealth that may have better served the best interests of the children by allowing them to remain close to home. Dr. Amy Kelly, Ben's treating psychiatrist, testified that she preferred Ben be placed in a residential treatment facility closer to home. N.T. Hearing, 9/21/04, at 128; N.T. Hearing, 9/22/04, at 181–182. Likewise, Dr. Jeremy Chiles, who performed a psychological evaluation of Ben while at the Walkabout Program, acknowledged that although family therapy can be conducted over the telephone, therapy and family involvement are an essential part of treatment. N.T. Hearing, 9/21/04, at 130; Trial Exhibits Part III, Exhibit No. 35, at 60, 62, 67. Our review further indicates that Father, a licensed psychiatrist, testified with regards to the residential treatment facilities available in this Commonwealth and submitted into evidence 10 brochures outlining the various treatment programs available in Pennsylvania. N.T., 9/22/04, at 35–36; Trial Exhibits Part I, Exhibits G–P. One of these facilities, Pressley Ridge, maintains a Wilderness Program at Ohiopyle similar to the Walkabout Program in Utah where Ben flourished and which has been used as a model for other wilderness programs around the world. *Id.*

¶ 8 Contrary to the court's findings, there is no evidence to indicate mother thoroughly considered any of the available facilities in Pennsylvania. *See* Trial Court Opinion at 7. Mother testified that she did not visit Adelphoi Village, which would have been provided by Tim's school district as an alternative school placement and was located in Westmoreland County where mother resides. N.T. Hearing, 9/21/04, at 110–111, 202–203; Trial Exhibits Part I, Exhibit H. Further, there is very little evidence that an adequate inquiry was made into the cost associated with the various residential treatment facilities available in Pennsylvania, and only sparse evidence was presented at trial on this matter. *See* N.T. Hearing, 12/22/04, at 39, 42.

¶ 9 Irrespective of the fact there remains considerable difference of opinion between the parties over whether placement of the children in a Pennsylvania residential treatment facility would have been covered by insurance or medical assistance, *see* appellant's brief at 31–36; appellee's brief at 15–20, we find the expenses associated with the out-of-state placements were unreasonable and excessive based on cost alone. The law in this Commonwealth requires that *each* parent has a duty to support his or her children and *both* parents may have to make sacrifices in order to meet this burden. *Christianson v. Ely,* 575 Pa. 647, 838 A.2d 630 (2003); *Sutliff v. Sutliff,* 339 Pa.Super. 523, 489 A.2d 764 (1985). It is undisputed that father's monthly net income was $13,136.00 after satisfaction of a $3,000 per month alimony obligation to mother. *See* Hearing Officer's Recommendation and Report, at 3, *attached to* Record, No. 43; Record, No. 9. The record further indicates that father pays a guideline support of $2,673 per month for the parties' two other children, and essentially worked the equivalent of two jobs in order to meet his obligations. N.T. Hearing, 9/22/04, at 63. As previously discussed, the trial court or-

dered father to pay 77% of the tuition and transportation expenses associated with placement of the parties' children in Rancho Valmora and Ivy Ridge. Trial Court Order, 5/24/05; *see also* Trial Court Order, 6/1/05. The cost of Ben's placement at Rancho Valmora was determined to be approximately $4650 per month, whereas Tim's placement at the Academy at Ivy Ridge was $3085 per month. *Id.*; Hearing Officer's Recommendation and Report, *attached to* Record, No. 43. Taken as a whole, father's obligation for the placement of the parties' children in out-of-state residential treatment facilities amounted to approximately $5955 per month.[2] Viewed in light of father's additional alimony and guideline support payments and the various residential treatment facilities that were available in Pennsylvania, we find this amount to be clearly excessive, if not confiscatory. Accordingly, we vacate the May 24, 2005 Order (clarified on June 1, 2005) and remand for a recalculation of father's support obligations following a thorough evaluation of the various residential placement facilities which were available in Pennsylvania and a comparison of the costs associated with each. It would appear that to the extent father, a professional mental health expert, withdrew from interaction with his children and apparently did not involve himself with their therapy, he abandoned the field of treatment and placement to his wife and the limited resources considered by the court. Mother, on the other hand, apparently became overwhelmed with the breakdown of treatment programs in or near the community and shifted the problems of the children to out-of-state placements. It is obvious that if the father's income had not been adequate to finance out-of-state private placement, the only alternative would have been commitment to Youth Development Cen-

ters in Pennsylvania. If these children (one of whom is now an adult at age 18) are to continue to be treated as family custody cases, rather than as delinquents, the trial court must shift its emphasis on placement and apportionment of costs to accommodate the factual circumstances.

■ ¶ 10 Having concluded the court misapplied the law with respect to the parties' support obligations and made factual findings not supported by the record, we now turn to whether the court properly calculated mother's earning capacity. *See* Appellant's brief at 36, 44.

■ ¶ 11 Pennsylvania law has long held that an award of child support is based upon the Child Support Guidelines promulgated by our Supreme Court. In relevant part, 23 Pa.C.S.A. § 4322(a), **Statewide guideline,** provides:

> Child and spousal support shall be awarded pursuant to a Statewide guideline as established by general rule by the Supreme Court, so that persons similarly situated shall be treated similarly. The guideline shall be based upon the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support. *In determining the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support, the guideline shall place primary emphasis on the net incomes and earning capacities of the parties,* with allowable deviations for unusual needs, extraordinary expenses and other factors, such as the parties' assets, as warrant special attention. The guideline so developed shall be reviewed at least once every four years.

*Id.* (emphasis added). In considering this matter, all reasoning must begin with an evaluation of a parties' income that is

---

2. [$4650 (Rancho Valmora) + $3085 (Ivy Ridge) ] x[.77] = $5955 per month.

available for support. The assessment of the full measure of a parent's income for the purposes of child support requires "courts...to determine ability to pay from all financial resources." *Darby v. Darby*, 455 Pa.Super. 63, 686 A.2d 1346, 1348 (1996) (citation omitted); *see also* 23 Pa. C.S.A. § 4302, **Definitions.**

¶ 12 In this case, the court concluded mother's earning capacity was $15,837.00 based upon her actual earnings as indicated in her 2003 tax return, noting "it would be inappropriate to assign an earning capacity for [mother's] first year back in the work force" because she "was out of the work force for approximately eight years." Trial Court Opinion at 7. Father maintains the court erred "in entering an Order based solely upon the $15,837.00 in business income reflected on Mother's 2003 tax return," and "should have...attributed an earning capacity or business income [to mother] of at least $27,084.00 based upon her 2004 tax return or an earning capacity as a medical researcher in an amount of $41,600.00, or earning capacity as a full-time real estate agent in an amount of $37,674.00." *Id.* at 44–45, 686 A.2d 1346. We agree.

¶ 13 It is well-settled that the determination of earning capacity does not involve the consideration of what one could theoretically earn. *Strawn v. Strawn*, 444 Pa.Super. 390, 664 A.2d 129 (1995). Rather, "[a] person's earning capacity is defined...as that amount which the person could realistically earn under the circumstances, considering his or her age, health, mental and physical condition and training." *Haselrig v. Haselrig*, 840 A.2d 338, 340 (Pa.Super.2003) (citation omitted). Additionally, we note "a court should consider the amount of time that a wife has been out of work during her marriage." *Strawn, supra* at 132 (citation omitted).

¶ 14 Here, the hearing officer accepted mother's representation of her business income based upon her actual earnings as indicated in her 2003 tax return, and the trial court adopted the hearing officer's recommendation without further consideration of mother's earning potential or substantially higher income in 2004. Our review of the record indicates that, despite the fact mother was out of the work-force from February 1995 to January 2003, the trial court attributed to her an earning capacity far less than what she realistically could earn over the course of a year. N.T. Hearing, 9/21/04, at 42. The court attributed mother with an annual earning capacity of just $15,837.00, which based on a 40–hour work week is less than $8 per hour, an amount far too low given Mother's background and the circumstances of this case. Mother holds a B.S. degree from Cornell University and previously was employed as a medical research assistant for approximately $20.00 an hour. Trial Exhibits Part 1, Exhibit D: *Mother's Deposition Testimony That Father Wishes to Offer into Testimony as Admissions*, at Nos. 41–43. Moreover, there is no evidence mother suffers from a physical or mental impairment of any kind that would prevent her from working. Subsequent to the parties' 2003 divorce, mother returned to work as a real estate assistant and during the last six months of that year earned $15,837.00 while employed part-time. Trial Exhibits Part 3, Exhibit No. 43; Trial Exhibits Part 1, Exhibit D, at Nos. 35, 39. At the hearing, mother testified that her income during the first six months of 2004 was about the same as it was for the last six months of 2003, clearly indicating she earned over $30,000.00 during that 12–month span. N.T. Hearing, 9/21/04, at 158–159. Moreover, our review of mother's 2004 tax return attached to father's June 22, 2005 Motion for Reconsideration indicates her business income increased

substantially in 2004, from $15,837.00 to $27,084.00. Trial Exhibits Part 3, Exhibit No. 43; Record, No. 55: *Defendant's Motion for Reconsideration,* Exhibit D. Accordingly, we find the court erred in basing mother's earning capacity merely on the actual earnings indicated in her 2003 tax return, and we remand for a recalculation in accordance with this Opinion.

¶ 15 The principal goal in child support matters is to serve the best interests of the children through the provision of reasonable expenses. *Oeler by Gross v. Oeler,* 527 Pa. 532, 594 A.2d 649 (1991). "The duty of child support, as every other duty encompassed in the role of parenthood, is the equal responsibility of both mother and father" and "must be discharged by the parents even if it causes them some hardship." *Yerkes v. Yerkes,* 573 Pa. 294, 297–298, 824 A.2d 1169, 1171 (2003) (citations omitted). As noted, the capacity to fulfill the parental obligation of support is dependant on one's property, income, and earning capacity, *Labar v. Labar,* 557 Pa. 54, 731 A.2d 1252 (1999), and to give effect to this requirement, the Pennsylvania Rules of Civil Procedure provide a comprehensive set of guidelines for the appropriate amount of child support to be contributed by each parent. *See* Pa. R.C.P. §§ 1910.16–1–16.7. Accordingly, we vacate the May 24, 2005 Order (as clarified on June 1, 2005) and remand for recalculation of mother's earning capacity and thereafter, recalculation of each party's support obligation in accordance with the guidelines promulgated by our Supreme Court. In so ruling, we emphasize the need for the court, in restructuring each party's obligation, to conduct a thorough evaluation of the cost of comparable residential treatment facilities in Pennsylvania. Further, the court must accurately calculate mother's true earning capacity, giving serious consideration to her edu-

cational background, past employment history, and earnings potential in her field.

¶ 16 Order vacated and case remanded for proceedings consistent with this Opinion.

¶ 17 Jurisdiction relinquished.