**Mandolos v. Tregembo**

*Jacqueline R. Mark,* for plaintiff.
*Lynn Erickson,* for defendant.

LASH, *J.,* February 13, 2009—This court held a child custody trial on February 10, 2009. At issue is whether defendant, Scherie Tregembo (Mother), who intends to move to Florida, should be permitted to retain primary custody of the parties' minor child. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Gustav Mandolos (Father), is an adult individual who currently resides at 2443 Leisczs Bridge Road, Reading, Berks County, Pennsylvania 19605.

(2) Defendant, Scherie Tregembo, is an adult individual who currently resides on Penn Bern Road in Bernville, Berks County, Pennsylvania 19506-8249.

(3) The parties are the natural parents of Madison Mary Mandolos, born August 14, 1996 (minor child).

(4) Father currently resides in the home of the paternal grandmother, Janet Mandolos, occupying the lower level of the house. Father has a steady girlfriend, Brieane Botwright, who spends a good deal of time at Father's residence, including some overnights, but maintains a separate residence in the house of her grandparents.

(5) Mother currently resides with the minor child and some friends on a temporary basis. Until January 1, 2009, she and the minor child resided next door at 89 Penn Bern Road, Bernville, Berks County, Pennsylvania. However, she decided not to renew the lease, based on her decision to move to Florida. The lease expired at the end of December 2008. Her next door neighbor, William, agreed to allow her and the minor child to stay in a bedroom at his home, pending disposition of this case. In accordance with this plan, Mother also sold some of her possessions and furniture.

(6) Mother intends to move to Nokomis, Florida, near Sarasota, with the minor child. Her plan is to reside with her niece, Tanya, and Tanya's two children, ages 5 and 2, for a six to 12-month period, until she finds suitable housing for her and the minor child.

(7) Tanya resides in the Laurel Nokomis School District. Mother intends to obtain housing in the same school district.

(8) Father resides in the Schuylkill Valley School District. From the time she first started school until the present, the minor child has always been enrolled in the Schuylkill Valley School District. Currently, and at all times, Mother also resided in the Schuylkill Valley School District.

(9) The parties are formerly husband and wife, having married in 1999. The parties resided together approximately 10 years before the marriage and continued residing together until approximately September 1, 2006, when Mother left the marital residence. The parties remained separate and apart, except for a brief period of four to six weeks in August/September 2007, when the parties attempted to reconcile. At this time, no divorce has been granted.

(10) Since the date of the parties' separation, the minor child has resided with Mother as primary custodian. On February 12, 2007, by agreement of the parties, the court entered a temporary order setting forth, among other things, that the parties would share legal custody, Mother would have primary physical custody, and Father would have partial physical custody every Wednesday after school to 8 p.m. and every other weekend commencing Friday after school to Sunday at 6 p.m.

(11) On May 29, 2007, upon agreement of the parties, a final order was entered, maintaining the same schedule.

(12) On or about November 5, 2008, Mother filed a petition for special relief in the nature of a petition to permit her to relocate and to modify the custody order.

Father opposes the move, resulting in this matter being set down for trial.

(13) Mother is currently employed part-time for S&G Auto Recycling, doing handiwork, working approximately 10 hours a week. She also receives a monthly check for the minor child from the Social Security Administration, due to Father's disability.

(14) Mother has not worked full-time since the birth of the minor child, working part-time at different jobs, including clerical work, bartending, and as self-employed in her home remodeling and home improvement business known as "Jill of All Trades."

(15) Mother was diagnosed in April of 2008 with vulvar cancer. She had surgery for the condition. She currently is under no treatment, but is examined every three months to determine whether further treatment is necessary.

(16) Father is disabled based on an injury to his back that he suffered while working at age 16. He continued to work as a sign erector for several years thereafter, but eventually, the condition worsened and he is now unable to work. As a result, he receives Social Security disability. Father is prescribed morphine, Tylenol and muscle relaxants for his back condition. Father also suffers from diabetes and takes medication for that condition.

(17) Father has been hospitalized on several occasions with pancreatitis. He admits that he has had issues with drug and alcohol abuse, resulting in his doctor advising him that he needed to cease the substance abuse immediately. Although he did not initially heed the doctor's

advice, he states he is now clean since November of 2008.

(18) If Mother relocates to Florida, she has been promised a full-time job from her brother, Rodney Tregembo, who owns parking garages and a valet business. She would be employed Monday through Friday from 8 a.m. to 4 p.m.

(19) The home in Florida, which Mother and the minor child would share with Mother's niece and her family, is a four-bedroom home in a nice neighborhood. Mother and the minor child would each have her own bedroom.

## II. DISCUSSION

In making disposition, this court considered the testimony of the parties, the paternal grandmother, Janet Mandolos, Father's sister, Connie Brooks, Father's paramour, Brieane Botwright, the in camera testimony of the minor child, and the exhibits of the parties.

As stated, Mother wants to move to Florida and is asking that she be permitted to retain primary custody of the minor child. Her proposal is that Father have custody during the summer months and during the minor child's Christmas and spring breaks from school. Additionally, the minor child would be permitted to come to Pennsylvania for extended weekends. Mother states she has investigated and is satisfied that the minor child can fly round trip for less than $100, a very reasonable cost under the circumstances.

Mother provides several reasons for her decision to move. First, all of her closest relatives have moved to

Florida. In contrast, in Pennsylvania, she has no one to assist her other than a few friends. This is important because she must provide care for the minor child and maintain employment. She states she receives no financial assistance from Father and little from the paternal grandmother. Additionally, the spectre of her cancer diagnosis is still present.

She would also be able to work full-time in Florida. Although she has attempted to find full-time employment in Pennsylvania, she has been unsuccessful. In Florida, she would work for her brother and would be guaranteed a position on a full-time basis for $15 an hour. She believes that this would be more than sufficient for her to maintain a separate residence for herself and the minor child.

She believes that the minor child has a strong preference to live in Florida. The minor child loves the beach and dislikes the winters in Pennsylvania. Additionally, the minor child has a strong interest in becoming a marine biologist. Near her proposed residence is a marine research laboratory, where the minor child could do volunteer work, eventually obtain a paying job, and potentially earn a scholarship, while pursuing her passion.

Mother states that she has always been the primary caretaker of the minor child, whether the parties were living together or apart. She oversees the minor child's schooling and medical care. She has always handled the day-to-day maintenance for the minor child. On the other hand, Father has been very little help to Mother. He spends a great deal of time sleeping and provides very little supervision. Mother states that for a month in

September 2008, while she worked as a bartender and had to maintain late hours at her employment, the minor child stayed overnight at Father's house, and it was Father's responsibility to get the minor child up for school. According to Mother, Father was unable to do this on a consistent basis, resulting in the minor child being late for school on several occasions. Mother also testified that she has had to hire a baby sitter when she was unavailable during the day to care for the minor child, even though Father and the paternal grandmother were available, because of their disinclination to take over these duties.

Mother states Father is involved in abusing drugs and alcohol. He drinks excessively and, according to Mother, has even bragged about it on a "My Space" website. He has been hospitalized for pancreatitis on numerous occasions, resulting from his substance abuse, and despite being warned by the doctor, has maintained his poor habits. According to Mother, Father, on one occasion, attempted suicide, resulting in him spending a few hours in the psychiatric ward in St. Joseph's Hospital.

Father and his family believe the move to Florida would not be in the minor child's best interest. They believe that this would result in a lack of stability. For one, the minor child would be removed from the area she grew up in and the school she has always attended. She would lose contact with her friends. Secondly, Father opines that Mother and her family do not get along. He questions whether Mother's brother would, in fact, provide her with a job. We note, however, that Father reaches this opinion, despite having no contact with

Mother's brother for approximately five years, and limited contact with any of Mother's family.

Both Father and the paternal grandmother testified that they had grave concerns that they would never get to see the minor child again if the minor child resided in Florida. This concern exists, even though a court order would require otherwise. Father states that Mother has denied him visits in violation of the current custody order. However, he has not pursued contempt of court proceedings because he could not afford to do so.

Father denies that the minor child has a strong interest in moving to Florida. He also believes that whatever interest she has in Florida is an interest in enjoying the beach, not an appropriate reason. The minor child has had some issues in school, primarily in math. Father opines that she would not be a serious student in Florida. However, Father was unable to be specific on the minor child's problems with school, as it appears that Mother correctly set forth that Father's involvement with the minor child's educational needs are minimal.

Father denies that he was responsible for the minor child being late for school, or that he sleeps an inordinate amount of time. He does sleep during the day, but only for one-hour naps, predominately because of the effects of his medication. Further, he sometimes has difficulty with his sugar level from the diabetes, which can cause him to become ill. He denies a suicide attempt.

Father testified that he has a wonderful relationship with the minor child, spending a great deal of time with her on matters that she enjoys. He states that he does help her with school work, including her art work. He says

she enjoys spending time in the summer at the in-ground pool located on his mother's premises.

Father also avers that Mother has issues with credibility. He alleged that she has forged checks in his name and has stolen money from a Merrill Lynch account in the amount of $50,000, which he received through a lump sum settlement award for his disability. Mother denies this, stating that Father authorized her to sign checks to obtain funds for various items Father or the parties wanted during the prior time the parties resided together.

The fundamental issue in all custody cases is the best interest of the child. *Richards v. Hepfer,* 764 A.2d 623 (Pa. Super. 2000). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

In the case of *Gruber v. Gruber,* 400 Pa. Super. 174, 583 A.2d 434 (1990), the Pennsylvania Superior Court established the following factors for the trial court to consider on relocation matters:

"(1) The potential advantage of the proposed move, economic or otherwise, and the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent; (2) The integrity of the motive of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; and (3) The availability of realistic,

substitute arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Richard v. Hepfer, supra* at 626. (internal quotations and citations omitted)

In examining the potential advantages of the proposed move and whether the move would substantially improve the minor child's quality of life, we note the opinion of the Superior Court in *Billhime v. Billhime,* 869 A.2d 1031 (Pa. Super. 2005), which is similar in several respects to this case. In *Billhime,* the mother, the primary custodian, also requested a move to Florida. Two primary reasons for the court's granting the request included Mrs. Billhime's ability to obtain full-time employment and to live close to a network of family and friends. Regarding her employment, Mrs. Billhime had obtained a job offer in the customer service department of a car dealership at $11 per hour with good benefits and a flexible schedule. Also, Mrs. Billhime had difficulties securing full-time employment in the proximity of her rural Pennsylvania home. The court found that the job offer provided her with the opportunity to become a financially independent single parent. The flexibility and benefits would "quite likely . . . contribute to her well-being and general happiness and, thereby, benefit the children's best interests." *Id.* at 1038. Additionally, the court found that Mrs. Billhime and the children would enjoy the support of their extensive network of family and friends in Florida, while Mr. Billhime's extended family was "far less cohesive and minimally involved with the children." *Id.* at 1038-39.

Similarly, Mother would also be able to enjoy a stronger economic foundation. Her proposed job appears to

be very secure, as her brother would be her employer. Likewise, this would permit her to have flexible hours. Her proposed schedule of 8 a.m. to 4 p.m. would enable her to be available when the minor child is finished with school. This contrasts with her current employment history, which consisted of obtaining part-time jobs here and there for the purpose of attempting to make ends meet while also retaining available time for the care and maintenance of the minor child. Father, though available, never ventured into assuming full-time caretaking responsibilities, which also impacts on Mother's difficulties here.

The family network is also important. Since mother's sister recently moved to Florida, all of Mother's family is now residing there. Mother, who is attempting to maintain independent living as a single mother, and who continues to process her current existence as a cancer survivor, can use as much support as possible. Unfortunately, she does not receive this support from Father. While Father asserts Mother is not close to her family, this assertion was without any corroboration and appears to be self-serving. The evidence suggests otherwise, particularly regarding Mother's niece and family with whom she would reside, as well as her brother and sister. The paternal grandmother and Father's sisters do have a positive relationship with the minor child, but this is compromised somewhat by difficulties between Mother and the paternal grandmother. In any event, the move to Florida, with the proposed schedule, with the minor child residing in Pennsylvania during the summer, would provide the minor child with access to both sides of the family on an ongoing basis.

We also believe that the quality of life would be improved for the minor child because of her preference for Florida and her passion for the water and marine life. The minor child's enthusiasm should be fostered, not restricted. While the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. *Ketterer v. Seifert,* 902 A.2d 533 (Pa. Super. 2006). Although we agree with Father that the opportunity to reside in a warm climate with a beach may be a strong motivator to a minor child in weighing a decision on where to reside, here, we find the minor child's interests to be of a wider scope. She is eagerly looking forward to the opportunity to work in a marine laboratory. She also wants to spend extensive time with Mother's side of the family. A move to Florida will give her the chance to thrive in an environment she thoroughly enjoys.

On the second test of *Gruber,* the integrity of the motives of the parties in maintaining their respective positions, we find that both parties are sincere. Mother has witnessed her family members, one by one, moving to Florida. She wants to join them. She also wants the opportunity to work full-time and maintain a decent household for her and her daughter. Since the separation, Mother has struggled. For a short time, she and her daughter resided on air mattresses in an apartment Mother had rented. Eventually, she was able to make ends meet sufficient to purchase furniture, which she bought secondhand. She has done what she could with what she had. In Florida, her means and, therefore, her standard of living would increase. Secondly, Mother's

plan regarding Father spending time with the minor child is appropriate. Mother does not appear to have any intention of depriving Father of extensive time with the minor child. For his part, Father has valid reasons for wanting the minor child to remain in Pennsylvania. For one, there is the continuity of keeping the minor child in the neighborhood and in the school district she has known. There is family support on Father's side for the minor child. Additionally, because of the distance, and because the parties have not gotten along in the past, Father's concern that there could be issues in actually seeing the minor child cannot be dismissed as mere paranoia.

The final test of *Gruber*, the availability of realistic, substitute visitation arrangements, are met. Like the *Billhime* case, Mother has proposed that the minor child reside with Father in the summer and visit with him during the Christmas and spring breaks, as well as other times. She is willing to permit the minor child to fly alone to visit Father. The minor child, likewise, has no apprehensions about this arrangement. The costs cited by Mother are very reasonable. As the Superior Court did in *Billhime,* we find the substitution arrangements to be realistic and appropriate.

On balance, the best interests of the minor child would be to retain Mother as the primary custodian. Mother has established herself as a parent who is willing to be industrious and make the necessary sacrifices for her minor child. She clearly has performed the lion's share of the requisite custodial duties. Father, on the other hand, has not established that he is prepared to take over full-time custodial duties of a minor child who is about to enter

her teenage years, particularly during school months, where it is critical that her studies be overseen. On the other hand, Father does maintain a positive relationship with the minor child, which can continue to be fostered during extensive time in the summer months.

Because of the strained relationship of the parties, and Father's concern that the order will be violated, this court emphasizes the importance that this order shall be strictly followed, except if the parties agree otherwise. If there is such an agreement, the agreement shall be in writing to ensure that there is no miscommunication. However, if one party is denied access to the minor child through improper actions by the other party, that would be a basis for finding the violating party in contempt of court, and could result in a review of this custody order.

We enter the following order:

## ORDER

And now, February 13, 2009, after trial held, custody of the parties' minor child, Madison Mary Mandolos, born August 14, 1996, shall be as follows:

(1) The parties shall share legal custody of the minor child.

(2) Defendant, Scherie Tregembo (Mother), shall have primary physical custody of the minor child during the school year. The school year is defined as commencing one week prior to the start of the minor child's school term and ending one week after the conclusion of the school term.

(3) Plaintiff, Gustav Mandolos (Father), shall have physical custody of the minor child during the summer months.

(4) The minor child shall be permitted to visit with Father during her Christmas break and spring breaks from school. Regarding the Christmas break, on odd-numbered years, the minor child shall travel to Father's home prior to Christmas Day and remain there until one day prior to the commencement of school; on even-numbered years, the minor child shall travel to Father's home on December 26 and remain there until one day prior to the commencement of the school term. The minor child shall leave one day after the break starts and return one day prior to the end of the break. The costs for the transportation shall be split evenly by the parties.

(5) Father may have partial custody time with the minor child, at such other times as the parties may agree. If the minor child travels to Pennsylvania at other times, the costs again shall be shared. If Father travels to Florida for a visit, Mother shall make appropriate arrangements to provide Father with time with the minor child outside the presence of Mother.

(6) The non-custodial party shall have reasonable telephone calling privileges with the minor child. Each party shall see to it that the minor child has a cell phone available to receive calls from the non-custodial party. Additionally, contingent upon whether the parties can afford to do so, the parties may utilize a web cam through a computer to enable the non-custodial party to visit with the minor child visually.

(7) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the child:

(A) The right to reasonable telephone contact with the child when he or she is in the other parent's custody.

(B) The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain the necessary information directly from the child's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the child and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the child at any time, any party then having custody of the child shall immediately communicate with the other party by telephone or by any other means, informing the other party

as to the nature of such illness, and during such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

(3) Neither party shall alienate nor permit to attempt to alienate the child from the other party. While in the presence of the child, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the child should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their child.

(6) The parties shall, at all times, consider the children/ child's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the child as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their child proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the child to make choices and run the risk of parental displeasure. However, the child shall be consulted as to his or her schedule when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor child.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the child to unnecessary apprehension and failure of expectations.

(D) The party having custody of the child should prepare him or her both physically and mentally for the transfer of custody to the other party and have him or her available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Pre-

40

determined schedules are not written in stone, and both parties should be flexible for the sake of the child.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa. R.C.P. 1915.12.